T. W. BICKETT, Governor, et als. v. THE STATE TAX COMMISSION.

(Filed 21 May, 1919.)

1. **Parties—Statutes—Governor—State Board of Agriculture—State Warehouse Superintendent—Cotton Warehouse Act.**

   The Governor, under the provisions of the Revisal, sec. 528, is the proper party plaintiff in an action for *mandamus* to compel the State Tax Commission to provide and enforce the machinery for the collection of the tax of twenty-five cents upon each bale of cotton ginned, etc., as provided by ch. 168, Laws 1919, entitled "An act to provide improved marketing facilities for cotton"; and the State Board of Agriculture and the State warehouse superintendent are also proper parties plaintiff under section 2 of the act in question, requiring that its provisions shall be administered by them.

2. **Constitutional Law—Statutes—Interpretation.**

   The constitutionality of a statute will be presumed, all doubts should be resolved in its favor, and it will not be declared unconstitutional by our courts unless it is so proved beyond a reasonable doubt.

3. **Same—Taxation—"Trades"—Cotton Ginners—Farmers—Special Tax.**

   Sec. 5, ch. 168, Laws 1919, entitled "An act to provide improved marketing facilities for cotton," enacts that on each bale of cotton ginned in North Carolina for two years, twenty-five cents shall be collected "through the ginner of the bale and paid into the State Treasury" to specially guarantee or indemnify the State warehouse system against loss, requiring the State Tax Commission to provide and enforce the machinery for the collection of the tax, etc.: *Held*, the act is constitutional and valid, and not in derogation of Article V, section 3 thereof, the tax contemplated being uniform upon those of the class designated, and being laid upon a trade, whether that of cotton ginning or farming, and is within the authority conferred on the Legislature to further "tax trades," etc.

4. **Constitutional Law—Statutes—"Workable" Provisions—Courts.**

   Whether a statute is "workable" in its intended beneficial effect is for the Legislature to determine, and will not be considered by the courts in passing upon the constitutionality of the statute.

5. **Constitutional Law—Taxation—State Agencies—Statutes—Mandates.**

   An agency of the State, required to provide the machinery for and the enforcement of a tax to be levied under the provisions of the statute, may not pass upon the constitutionality of the act and refuse to obey its mandate.

WALKER, J., concurring in result; ALLEN, J., concurring in part only.

APPEAL by defendants from *Allen, J.,* at chambers in Raleigh, 22 April, 1919.

This is an action for a mandamus instituted by the Governor of the State, the State Board of Agriculture, and the State warehouse super-

28—177

intendent, against the members of the State Tax Commission to require them to provide and enforce the machinery for the collection of the tax provided by an act of the General Assembly of 1919, entitled "An act to provide improved marketing facilities for cotton," being chapter 168, Laws 1919. At the hearing before Allen, J., at chambers in Raleigh, 22 April, 1919, the "State Farmers Union" on its own application was permitted to intervene and was made additional party plaintiff.

It is alleged in the complaint, and it is admitted by the answer, that the defendant Tax Commissioners refused and declined to execute the statute upon the ground that it was unconstitutional and invalid. This proceeding has been brought by the Governor under authority of Rev., 5328, which makes it the duty of the Governor "to supervise the official conduct of all executive and ministerial officers and to see that the duties thereof are performed, or in default thereof apply such remedy as the law allows."

From the judgment of *mandamus* to proceed to execute the statute the defendants appealed.

*James H. Pou and J. Crawford Biggs for plaintiffs.*
*Marion Butler for the "Farmers Union," intervenors.*
*Attorney-General Manning and Assistant Attorney-General Nash for defendants.*

CLARK, C. J. The defendants having failed and refused to execute the statute this action was properly brought by the Governor. *Russell v. Ayer,* 120 N. C., 185; Rev., 528. Section 2 of this statute provides that it shall be administered by the State Board of Agriculture through the State Warehouse Superintendent, and they have been made parties plaintiff. They are proper, if not necessary, parties. *County Board v. State Board,* 106 N. C., 81; *R. R. v. Treasurer,* 68 N. C., 502. The "Farmers Union" of North Carolina, representing a large number of the farmers of the State, largely interested in the enactment and enforcement of the statute, has been made, on its own petition, an additional party plaintiff. There has been no objection to this, and we do not see that there could be any.

It is not necessary to set out the entire act whose scope is to authorize the leasing or aid in the construction or leasing of warehouses for the storage of cotton throughout the State, and providing an indemnity fund in order to make the warehouse certificates collateral for loans in the banks or other financial agencies lending money upon such securities.

The allegation of unconstitutionality is based on section 5 of the act which is as follows: "On each bale of cotton ginned in North Carolina, in the two years ending 30 June, 1921, twenty-five (25) cents shall be

collected through the ginner of the bale and paid into the State Treasury, to be held there as a special guarantee or indemnifying fund to safeguard the State Warehouse system against any losses not otherwise covered. The State Tax Commission shall provide and enforce the machinery for the collection of this tax, which shall be held in the State Treasury to the credit of the State Warehouse system."

It is an elementary principle of law, as held by the U. S. Supreme Court, that no act can be held unconstitutional unless it is so "proved beyond all reasonable doubt." *Ogden v. Saunders,* 12 Wheaton, 213; Cooley Cons. Lim. (7 Ed.), 254. This is quoted with approval in *Sash Co. v. Parker,* 153 N. C., 134. To same purport, *Walker, J., Johnson v. Board of Education,* 166 N. C., 468; *Whitford v. Comrs.,* 159 N. C., 160; *Hoke, J.,* in *Bonitz v. School Trustees,* 154 N. C., 379. All reasonable doubts must be resolved in favor of the constitutionality of legislation. *Allen, J., In re Watson,* 157 N. C., 347. Every presumption is in favor of the constitutionality of an act of the Legislature, and all doubts must be resolved in support of the act.

The courts may resort to an implication to sustain an act, but not to destroy it. *Connor, J.,* in *Lowery v. School Trustees,* 140 N. C., 40. Statutes are presumed to be valid and every reasonable doubt must be given in favor of their validity. *Merrimon, J.,* in *Holton v. Comrs.,* 93 N. C., 434. There are many other decisions to the same effect in this Court and in the U. S. Supreme Court. Indeed, they are uniform on this point.

The Constitution, Art. V, sec. 3, provides: "Laws shall be passed taxing, by uniform rule, all moneys, credits, investments in bonds, stocks, joint-stock companies, or otherwise, and also all real and personal property, according to its true value in money. The General Assembly may also tax trades, professions, franchises and incomes."

The plaintiffs concede that this is not a property tax, and rely upon it being a tax upon a trade or·franchise. In *Smith v. Wilkins,* 164 N. C., 140, this Court, through *Allen, J.,* held: "The term 'trades' in Art. V, sec. 3, includes any employment or business embarked in for gain or profit," citing *S. v. Worth,* 116 N. C., 1010, wherein the Court said: "When the word 'trades' is used in defining the power to tax, the broadest signification is given to it."

In *Lacy v. Packing Co.,* 134 N. C., 571, the Court sustained an act taxing "every meat packing house doing business in the State $100 for each county in which such business is carried on." This case was affirmed on writ of error, 200 U. S., 226, and has been cited and approved in *Land Co. v. Smith,* 151 N. C., 75, in which *Hoke, J.,* says: "The power of the Legislature in this matter of classification is very broad and comprehensive, subject only to the limitation that it must appear

to have been made upon some reasonable ground—something that bears a just and proper relation to the attempted classification and not a mere arbitrary selection," citing numerous cases.

The same subject is fully discussed by *Allen, J.,* in *Smith v. Wilkins,* 164 N. C., 140, in which he says: "In *S. v. Worth,* 116 N. C., 1010, the Court defines the term 'trades' as including any employment or business embarked in for gain or profit, and while the Constitution, Art. V, sec. 3, is mandatory upon the General Assembly to levy a tax upon all *property* by a *uniform rule,* the authority to tax trades is permissive only, and no rule as to the method is prescribed." The Constitution does not prescribe uniformity in the tax on trades, and the court decisions require only that such tax must be equal upon all persons belonging to the class upon which it is imposed. *Gatlin v. Tarboro,* 78 N. C., 122; *Lacy v. Packing Co.,* 134 N. C., 571.

In *Mercantile Co. v. Mount Olive,* 161 N. C., 125, it is said: "In *Lacy v. Packing Co.,* 134 N. C., 572, the above authorities and others were cited, the court thus summing up the law: 'It is settled that a *license tax is uniform when it is equal upon all persons belonging to the described class upon which it is imposed.'* " It is pointed out that the constitutional provision requiring uniformity applies only to property, but as to license taxes, it quoted with approval the following from *S. v. Stephenson,* 109 N. C., 734 (26 Am. St., 595): "It is within the legislative power to define the different classes and to fix the license tax required of each class. All he can demand is that he shall not be taxed at a different rate from others in the same occupation, as classified by legislative enactment. This is stated as a universal rule. 1 Cooley on Taxation (3 Ed.), 260."

In Connor & Cheshire on Constitution, 271, it is said: "It is unquestionably in the discretion of the taxing power to graduate the tax according to the extent of the business so taxed, or to impose a single tax upon an occupation without regard to its extent."

"In *Winston v. Taylor,* 99 N. C., 210, under a provision of the charter of Winston, in exactly the same language as section 30 in the charter of Mount Olive, it was held that an ordinance of the town imposing a graduated tax on dealers in leaf tobacco was valid. In *S. v. Worth,* 116 N. C., 1007, it was held that a charter conferring the power to levy a license tax on 'trades' must be interpreted not only as embracing the occupation of mechanics or merchants, but all who are engaged in any employment or business for gain or profit." *Mercantile Co. v. Mount Olive,* 161 N. C., 126.

"The Legislature is sole judge of what subjects it shall select for taxation (other than a property tax which must be uniform and *ad valorem*), and the exercise of its discretion is not subject to the approval

of the judicial department of the State." *Lacy v. Packing Co.,* 134 N. C., 573; *Dalton v. Brown,* 159 N. C., 180; *Land Co. v. Smith,* 151 N. C., 75."

"The very idea of classification is inequality, so that the effect of inequality in no manner determines the matter of constitutionality." *R. R. v. Matthews,* 174 U. S., 106, quoted with approval in *Smith v. Wilkins, supra.*

The defendants rely for the unconstitutionality of section 5 chiefly upon the words therein "on" and "through," but the requirement of the payment of 25 cents *"on* each bale of cotton ginned" in this State, "to be collected *through* the ginner of the bale," is not a property tax nor an *ad valorem* tax. The expression "on each bale" is merely the method of measuring the tax upon each gin by the business done. It may be that the Legislature by the provision that "the 25 cents shall be collected through the ginner and paid into the State Treasury" contemplated that this tax, as is the case with most others, would be "passed on" to the producer or laborer. But the statute does not require that it shall be passed on. The ginner may, if he sees fit, pay the tax and advertise the fact to attract business. But it is immaterial whether the tax is upon the ginning business or upon the business of raising cotton, to be collected when it is put into a marketable shape by being ginned and baled. In either event, it is a tax upon the occupation, whether that occupation is ginning or raising cotton. The method adopted is that the ginner who puts it into condition for marketing shall pay the tax. This is a matter which rests solely in the legislative discretion. There is a very similar tax of 2 cents per bushel upon the business of dealing in oysters for market. Laws 1909, ch. 585, sec. 7; Gregory's Supp., 2419. There has been in the past also a tax upon the business of distilling liquors levied upon the number of gallons distilled. Doubtless the distiller passed that tax on in the reduced price paid for apples, peaches or grain used in his business or in the higher price for his product. Whether this was called an excise tax or revenue tax it more nearly approximated a just distribution of the burden than the retail tax upon intoxicating liquors which was levied upon each barroom irrespective of the quantity sold. Which measure should be adopted was a matter for the Legislature and not for the courts. *S. v. Powell,* 100 N. C., 525, and citations thereto in Anno. Ed. The 25 cents is less than one pound per bale.

This act recites the object in passing the statute in the first section thereof: "In order to protect the financial interests of North Carolina by stimulating the development of an adequate warehouse system for our great staple crop, cotton, in order to enable growers of cotton more successfully to withstand and remedy periods of depressed prices, in

order to provide a modern system whereby cotton may be more profitably and more scientifically marketed, and in order to give this important crop the standing to which it is justly entitled as collateral in the commercial world, a cotton warehouse system for the State of North Carolina is hereby established as hereinafter provided." This is a clear statement that the legislative purpose is to serve the public interests.

It is a matter of common knowledge that many farmers and tenant farmers are not able to raise their crops except by procuring advances upon the faith of the same, and when heretofore the crop matured these farmers were compelled to sell the crops as soon as ready for the market in order to discharge their obligations. The clear object of this statute is by aiding in the establishment of a warehouse system, and providing for an official grading of the cotton therein, and the issuance of warehouse certificates, to enable the raisers of the cotton to obtain money on such certificates to discharge their indebtedness and hold the cotton to be sold by them from time to time later on, as the condition of the market may justify. This will be a distinct benefit even to the raisers or holders of cotton who do not store it in these warehouses by removing from competition large masses of "distressed cotton" which otherwise would be thrown upon the market in November and December. The only special interest which would seem to be opposed to this matter of public policy is that class who heretofore by reason of the sales of cotton by the farmers in the early fall were enabled by their better financial condition to buy and hold it for sale in the late spring to their great pecuniary advantage, but with the loss of millions of dollars to those whose labor and land produced the cotton. It is to prevent that state of things that at the instance of the farmers, tenants, and farm laborers of the State this statute was passed.

There was a "Warehouse Receipts Act" enacted by the last General Assembly, ch. 37, Laws 1917, but it lacked (like a similar statute in S. C.) the essential feature of the tax of 25 cents per bale, which will raise probably $200,000 a year as a guarantee fund behind the warehouse certificates to guarantee such certificates and make them acceptable as collateral as it will insure the title of the cotton against litigation arising out of liens (which might be recorded in another county than where the mortgagee resides) or any other defects.

The defendants also object to the statute upon the allegation that it is not "workable," but that is a matter for the Legislature, which after full debate thought differently by enacting the statute. Section 5 provides that at least one-half of the fund raised by the 25 cents per bale— which on the 917,000 bales raised in this State last year would be nearly $230,000 cash—"shall be invested in amply secured first mortgages to aid and encourage the establishment of warehouses operating under this

system, such investments to be made by the Board of Agriculture with the approval of the Governor and Attorney-General: *Provided,* such first mortgages shall be for not more than one-half the actual value of the warehouse property covered by such mortgages and run not more than ten years."

The defendants differ with the Legislature and think that such provision will not be adequate to furnish all the warehouses necessary. If the defendants are right in this contention, that would not make the act unconstitutional, and the measure would still be valuable so far as it would reach. In fact, however, there are already in existence many warehouses throughout North Carolina which can be leased, as is evidenced by the provisions of the act based doubtless on the knowledge of the legislators, and besides, the towns in which cotton is marketed will of course compete with each other in furnishing such facilities by constructing these buildings for lease where needed in order to meet the competition of other towns in which cotton is stored for marketing.

Said section 5 provides that the money paid in (which includes the half invested in mortgages on the warehouses) shall be held in the State Treasury "as a special guarantee or indemnifying fund to safeguard the State Warehouse system against any losses not otherwise covered," and it is collected "in order to provide the financial backing which is essential to make the warehouse receipts universally acceptable as collateral, and in order to provide that a State warehouse system intended to benefit all cotton growers in North Carolina shall be supported by the class it is designed to benefit."

By the census, 81 per cent of the people in this State are engaged in farming and a large part of them are interested in raising cotton. The fifty-three counties in North Carolina in which cotton is produced are vitally and directly interested in this statute. Even at 25 cents per pound the cotton crop of this State is worth $24,000,000 more than our tobacco crop at its present high prices and $12,000,000 more than our entire corn crop. For the protection of this, the greatest crop of the State, this cotton warehouse system has been established to be operated under State management. The act so declares the purpose. Even if all of the benefits should primarily go into the pockets of the growers of cotton, the resulting benefits would extend to every class of the people of the State. The system has been thought out, framed and advocated by and on behalf of the cotton farmers of the State. Its passage has been asked by the "Farmers Union" and supported by the State Agricultural Department, for the purpose of keeping within the State many millions of dollars annually, which have heretofore been drained from the State by the special interests which have profited enormously by the

forced early marketing of cotton, bought up and hoarded for sale, to the manufacturers later on.

This act intends to do for the cotton farmers in North Carolina what the "Reserve Banking" system adopted by Congress has done for the banks and other financial interests in affording a sure and reliable supply of money, thus preventing the panics heretofore prevalent.

The act, too, is so framed that it does not take any money out of the general treasury of the State to establish this system (though the State had power to do so). It does not compel any owner of cotton to store it in these warehouses, nor does it close the doors of the warehouses to those cotton growers who have some form of lien on their cotton, for the act provides that every bale of cotton can be stored, but requires that the real owner must first be determined and the warehouse receipts shall be in the name of such owner. It is true there may be some mistakes made, and for that reason the fund is provided to guarantee the holders of the warehouse certificates against loss.

The cotton grower who is in debt will be the most helped by the operation of the warehouse system, as it enables him to secure money to pay off his lien and hold his cotton for a better market which will be achieved by the gradual sale of the crop. On the other hand, the man who sells without storing will be benefited by having an unglutted market because a large part of the cotton crop will be stored in these warehouses to be sold later, and thus removed from competition.

No cotton grower appears in this case as protesting against this tax, but, on the other hand, the Farmers Union who have intervened as plaintiffs are now here representing largely the class of farmers who raised the cotton or who have liens upon their cotton, and they through their learned counsel are earnestly pleading for the validity of this act as is also the Agricultural Department of the State.

The defendants attack only section 5 of the act, and contend that there will still be enough left to make it useful and effective if that section is eliminated. It is true the act, if intended only as a "Warehouse Act," would be operative, but it would be largely useless if the fund to aid in establishing warehouses and to guarantee the certificates provided by section 5 is struck out. It is that section which makes the warehouse receipt for each bale of cotton negotiable and as good as a government bond by providing the guarantee fund. The warehouse charges will go to the owners of the warehouse, and where the State leases a warehouse this act requires that after paying the lease charges the warehouse shall be operated at cost.

The farmers of the State are our largest creators of wealth. The agricultural departments at Washington and Raleigh have been created in recent years in recognition of the fact that the farmers had received

in return small assistance from the government to whose support they so largely contributed. The cotton crop which in 1910 in this State was 600,000 bales, in one year since has been over 1,100,000. The other farm products have also increased greatly in volume and value. Yet the farmers and the State have not increased in wealth in the same ratio. The weak spot, as stated by Mr. Butler in his argument on behalf of the "Farmers Union," has been that these great staple crops have not been properly marketed, which has been due to the forced sales required to meet the obligations incurred in raising the crops.

It is passing strange that when a measure of this kind, devised and advocated by the farmers themselves in their county and State Farmers Union, and by the State Agricultural Department and by those who specially represented the farmers in the General Assembly and who have voiced their wishes and their needs by devising a system of this kind intended for their protection (the cost being defrayed by a small tax upon the products raised by the farmers themselves or upon the process of ginning and baling to make it marketable), there should be raised, not by them but by others, opposition upon the allegation that such measure is *unconstitutional!* If this measure could be struck down the damage would be sustained by the farmers and the profits would inure to those who have heretofore received large profits by reason of the farmers being forced to market their produce in competition with each other because unable to obtain money to pay off the pressing liens upon their products.

Our farmers, owing to the conditions surrounding them, have been forced to take the prices for their products fixed by foreign mill-owners who more than once have run the price down to 4½ cents at the gin-house door. This act is intended to emancipate the growers of cotton by providing a safe place to store the product at a reasonable cost with the advantage of cheap insurance and the protection of official grading. But these would be of themselves of little value without this provision of a guarantee fund for the warehouse certificate enabling the owner to hold his cotton and thus have an opportunity to fix a living price for the product of his labor and land.

If there are defects in this bill, time and experience in the operation of the act will reveal them, and it is for the Legislature then to cure such defects upon the application of those interested in the system. The act may not be perfect, but it was the best system that the friends of those intended to be benefited by the passage of the act were able to devise and get enacted. The chief difficulty to its passage—that it would call for an appropriation by the State—has been avoided by raising the funds by a tax (whether on ginning or raising cotton is immaterial) measured by each bale ginned. The owner of every bale ginned will be

benefited far more than the 25 cents raised by this tax, whether he stores in the warehouses provided in this act or without storing sells in a market without competition from the sale of "distressed cotton."

Even if it could be held that "trades" do not embrace the business of "ginning" or "raising cotton," still there is no prohibition upon the Legislature to levy taxes upon any business or other sources than trades, professions, and franchises. The Legislature of the State has all power as to taxation or otherwise which is not forbidden it by the Constitution of the State or Union. The restriction upon the taxation of tangible property is that it must be *ad valorem* and uniform. There is no such restriction upon the taxation of trades, professions and franchises and incomes, and the court has held that in fact there is uniformity in taxation as to the first three whenever it is equal upon all persons belonging to the class upon which it is imposed and that taxation can be graduated upon incomes. Nor does the recital of the power to tax "trades, professions, franchises and incomes" restrict the Legislature to those sources. We have held valid taxes upon inheritances and license taxes, and perhaps other taxes, which do not come within these words.

Much of the cotton is carried to the gins by merchants or purchasers of cotton in the seed, so the tax is on the business of ginning. But it is in the power of the Legislature in its good judgment to tax the business or occupation of cotton farming without taxing all other kinds of farming, especially when as here the benefit is intended solely for those engaged in marketing cotton. The Court has held that the Legislature has the power to divide the business of selling clothing into separate classes, *i. e.,* those dealing in new clothing and those dealing in second-hand clothing and levying a separate and different tax on each class. *Rosenbaum v. New Bern,* 118 N. C., 83; and that it could classify the users of the public roads into classes, levying a different tax on each. *Dalton v. Brown,* 159 N. C., 175; *Mercantile Co. v. Mount Olive,* 161 N. C., 124, 125.

The constitutionality of acts authorizing an *ad valorem* tax upon the goods, and at the same time a tax upon the business according to tonnage, was upheld in *Guano Co. v. Biddle,* 158 N. C., 212, as also the validity of the assessment of the cost of improvements in drainage districts. *Sanderlin v. Luken,* 152 N. C., 738; *Shelton v. White,* 163 N. C., 92. Even as to the property tax which must be levied *ad valorem* and with uniformity, the court held that this did not require uniformity in the application of the proceeds, for oftentimes the State or the county may expend a large part of its revenues in one locality and less or none at all in another locality. *Holton v. Comrs.,* 93 N. C., 430, 437.

The Supreme Court of the United States, in *Marbury v. Madison,* asserted the right of the judiciary to set aside an act of Congress or of

a State Legislature, if it deemed such act unconstitutional, which has been followed by the State courts. But the restriction has always been stated that such power could not be exercised except when the act was unconstitutional "beyond a reasonable doubt." And even with such limitation the authority of the courts to do this has been denied by Presidents Jefferson, Jackson, Lincoln, Garfield, Roosevelt and many other eminent lawyers, except in cases falling under the provision that "the Constitution of the Union and the laws made in pursuance thereof shall be supreme," U. S. Cons., Art. VI, chs. 1, 2, or in cases coming within "the judicial power of the United States," as defined in the Constitution, Art. III, sec. 2, chs. 1 and 2. In what instances the courts will exercise such power, therefore, has always been a matter of careful and considerate discussion by the court in each case. *Adhuc sub judice ·lis est.*

So far as we know, it has not heretofore been contended that this most important and delicate power of holding legislation invalid has been extended to any subordinate agency of the executive department.

There have been three cases in which a State official has brought a *mandamus* against another, but in none of these did the defendant refuse to act on the ground that the Legislature had passed an unconstitutional act. In *Scarborough v. Robinson,* 81 N. C., 409, it was sought by the Superintendent of Public Instruction to compel the Speakers of the two houses to sign a bill which they had inadvertently failed to do. It was held that the court had no jurisdiction to order the Speakers to sign. In *Carr v. Coke,* 116 N. C., 224, the plaintiff, acting solely as a "citizen on behalf of himself and other citizens" (though in fact he was Governor), sought to go behind the ratification of the bill, not on the ground of unconstitutionality, but upon the allegation that it had been fraudulently and erroneously enrolled without having been really enacted, and the court held that it had no jurisdiction and affirmed the dismissal of the proceeding.

In *Russell v. Ayer,* 120 N. C., 180, the Governor brought a proceeding to construe an act of the Legislature differently from the defendant State Auditor, and to require him to make out the tax blanks in a different manner from the construction placed upon the act by the Auditor. The defendant demurred upon the ground that the complaint did not state a cause of action, and this Court so held. In neither of these cases did the defendant refuse to act upon the allegation that the act of the Legislature was unconstitutional.

If the Tax Commission can hold a statute unconstitutional and refuse to execute it on that ground, any other governmental agency such as a sheriff, or a deputy sheriff, or a constable has the same power. Owing, however, to the importance of the question to the people of this State

we will pass by, without further discussion, this proposition, which if recognized would be full of possibilities and without limitation.

The Governor and the Commissioner and Board of Agriculture are endeavoring to enforce the statute, being represented by two distinguished lawyers employed specially for the occasion, and the Tax Commission is endeavoring to vitiate and set it aside, being represented by the Attorney-General. Thus the State stands to lose in any event, all the expenses and costs being borne by the State Treasury, whatever the result. No one, nor any special interest claiming to be injured by the statute, has been made a party or assumed liability for any part of the counsel fees or costs. The act of the Legislature recites that it was passed for the benefit and protection of the farmers of the State and the "Farmers Union" has been made a party on its own application, seeking to uphold the statute.

Under the present system the first street buyer who sees cotton coming into town raises his hand and claims the cotton and other buyers hold off till they in turn first see another load of cotton coming into market. The owners of the cotton have no free market for their cotton and no place to maintain a fair and adequate price as the result of the labor unless an act such as this can enable them to procure an advance of money upon cotton stored as contemplated by this act.

As was well said by Judge Biggs and by Mr. Pou in their argument, "The cotton farmers ask the State merely to furnish the machinery. They pay the entire expense. The State assumes no responsibility and risks nothing. It will be difficult to formulate a real reason why the State should deny the request made of it by a large body of its hardest working and poorest paid citizens."

When a legislative act has been duly ratified by the law-making department of the government, it is not merely *prima facie* law, but it is "the law" unless repealed by that body itself, or declared unconstitutional by some tribunal vested with judicial power to declare it unconstitutional upon the application of some party in interest who shall show beyond a reasonable doubt in the minds of such tribunal that his interest in the matter in controversy was protected by the Constitution, and has been infringed by the statute. This State has always refused to give the veto power to the Governor. The Tax Commission cannot veto or deny the validity of an act of the Legislature. They should obey it unless enjoined by the courts.

But the lack of a party averring damage to him by the act does not, as has been suggested, entitle the defendants to have this action dismissed. The plaintiffs are entitled to their *mandamus* to compel the defendants to execute the duties required of them by the statute. We have therefore considered and decided on its merits the objection to the

constitutionality of the statute so ably and interestingly argued by coun-
sel on both sides.

Affirmed.

WALKER, J., concurs in the result, and is of the opinion that the statute
in question is valid; and further, that whether the respondents can
raise the question of its validity or not, this Court should, because of
the great importance of the matter to the people of the State, decide
whether the statute is constitutional and valid. Either ground of de-
cision, that respondents cannot raise the question by plea or that the
act is valid, would result in an affirmance of the judgment, and we may
choose the ground upon which we will base our decision if it is an ade-
quate one and supports the ruling below.

There may be defects in the act, and if so, they can be removed by
legislation, after we have had experience with it in actual operation,.
and can then see what is needed to perfect it. They are surely not so
vital as to be fatal to its validity. A statute should be sustained, if
possible, by any fair and reasonable construction of its language, and
not set aside as unconstitutional unless plainly and palpably so. We
should indulge every presumption in its favor, and not defeat its full
enforcement unless compelled to do so by a manifest conflict with the
organic law.

Applying this well-settled rule, I am unable to declare that this act
has not the sanction of the Constitution. I believe that strong argu-
ments can be advanced to show that there is no such conflict, and that
the act should stand as it is written. Legal minds may well differ as.
to the validity of the statute, but it appears to me that a liberal interpre-
tation of its terms, which should be the one adopted in favor of its con-
stitutionality, will disclose a scheme devised for the betterment of the
public, which is in perfect harmony with the fundamental law. I for-
bear any further discussion of the matter, as the opinion of the Court,.
as written by the Chief Justice, sufficiently covers the ground.

ALLEN, J. (concurring in part only). I agree to that part of the
opinion of the Court which holds that the defendant, the State Tax
Commission, cannot raise the question of the constitutionality of the tax
of 25 cents on each bale of cotton ginned, and I think the writ of *man-
damus* ought to issue to require the performance of the only duty im-
posed on the Commission by the statute, which is to "provide and en-
force the machinery for the collection of this tax," although there is
authority for the position that an executive officer may refuse to obey
a statute upon the ground of its unconstitutionality, when so advised
by the Attorney-General (*S. v. Williams,* 232 Mo., 56), and I think

there can be no criticism of the Attorney-General. When asked for his opinion he could not do otherwise than exercise his best judgment, and the opinion given cannot be said to have no foundation on which to rest.

The writ, therefore, while it should issue, ought to be in the alternative and not peremptory, as no one has shown any disposition to defeat the purpose of the act, and there is every reason to believe the defendant will at once perform its duty as declared by this Court, and if it should not do so the peremptory writ would then issue.

This may appear to be technical, and as indicating too much deference to form, but it involves the principle that the Judicial Department will not interfere with either the Legislative or Executive departments when it can be avoided, and then only to the extent absolutely necessary.

The authorities, denying the right to public officers to raise the constitutional question when not injuriously affected, are collected in the notes in 6 R. C..L., 92, where the editor says: "Under the general principle that the constitutionality of a statute cannot be questioned by one whose rights it does not affect and who has no interest in defeating it, the question has arisen whether a public officer has such interest as would entitle him to question the constitutionality of a statute and refuse to comply with its provisions; and it has generally been answered in the negative, since the interest of such officer is official and not personal, and if the rule were otherwise petty ministerial officers of the State could ignore any law which they deem to be invalid. This is especially true of subordinate officials."

It is doubtful if the exception from this rule approved by the Missouri Court in S. v. Williams, supra, ought to prevail in any case, but certainly not, I think, when, as appears in this record, the head of the Executive Department, the Governor, is asking that the statute be enforced, and when the defendant is required to do nothing except provide machinery for the collection of the tax, which it is lawful for it to do.

My agreement with the Court, however, on this question forces me to the conclusion that we ought not now to decide whether the tax of twenty-five cents is constitutional or unconstitutional, because "Courts will not assume to pass upon constitutional questions unless properly before them, and the constitutionality of a statute will not be considered and determined by the courts as a hypothetical question. It is only when a decision on its validity is necessary to the determination of the cause that the same will be made, and not then at the instance of a stranger, but only on the complaint of those with the requisite interest. These principles have been recognized by the Supreme Court of the United States. That tribunal has announced that it rigidly adheres to the rule never to anticipate a question of constitutional law in advance

of the necessity of deciding it, never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied, and never to consider the constitutionality of State legislation unless it is imperatively required." 6 R. C. L., 76.

"Courts never pass upon the constitutionality of statutes except in cases wherein the party raising the question alleges that he is deprived of some right guaranteed by the Constitution, or some burden is imposed upon him in violation of its protective provisions." *St. George v Hardie,* 147 N. C., 97.

The authorities, in great numbers, are unanimous in support of this principle, and they proceed upon the idea that as the different departments of government are separate, and neither should interfere with the other except from necessity, that the same rule which requires the Court to resolve all doubts in favor of the constitutionality of an act, also enjoins the duty of withholding its hand without considering or passing on its validity, unless the question is directly presented by one who will be injured by its enforcement, and here the question is raised by the Tax Commission, which pays nothing, and the cotton growers, who will pay the tax, under the opinion of the Court, either directly or through the ginner, are not parties, have not been heard, are not complaining, and we are assured by counsel that they will pay without objection, if given an opportunity to do so, which they would have the right to do although the tax might be invalid.

Why, then, should we decide the question at the instance of one who is not required to pay anything when those upon whom the tax is assessed are not resisting it, and when, if invalid, they may waive any constitutional objection and pay, and the question may never arise?

No principle of taxation of more serious import nor one with greater possibilities has been before the Court, and if once established it must be followed to its legitimate and logical conclusion.

It is conceded by counsel for the plaintiffs, and this is not controverted in the opinion of the Court, that the tax cannot be sustained as one on the bale of cotton as property, because violative of Art. V, sec. 3, of the Constitution, which requires taxes on property to be uniform and at its true value, and this tax is levied without regard to the weight, grade, or value of the cotton.

Counsel are then forced to resort to the latter part of Art. V, sec. 3, of the Constitution, which says "The General Assembly may also tax grades, professions, franchises," and to contend that the tax is not on the cotton but on the trade, profession or franchise of ginning cotton, and this is the position sustained by the Court.

I cannot agree to this construction of the statute, and in my judgment it is subversive of its plain unequivocal language.

The statute says *"on each bale of cotton ginned . . . twenty-five cents shall be collected through the ginner,"* which to my mind can only mean that a tax is levied on the cotton and that the ginner is the col- lecting agent.

Nor am I prepared to say that the occupation of ginning cotton falls. within the meaning of "trades, professions, franchises," and the lan- guage used in the statute does not justify the conclusion that the General Assembly so intended, and up to this time no one has contended that a privilege tax can be charged for producing materials for clothing and food from the soil.

It is true the tax is small and not burdensome, but if a tax of twenty- five cents a bale can be levied it can be increased to $5, and if this can be done for safeguarding a warehouse system it will be equally legal for any other public purpose, and the same rule will apply to tobacco, corn, wheat, potatoes, etc.

In other words, if a privilege tax of twenty-five cents a bale can be assessed against the grower of cotton, the same will be legal against any other producer from the soil. If it is legal for protecting a warehouse system, it is legal for other public purposes, and as the only limitation on privilege taxes is uniformity within the class, and none as to amount, the tax may be increased at the pleasure of the General Assembly.

This is a new and fruitful field of taxation, which I must decline to enter at least until those who are to pay the tax, the cotton growers, are before the courts and have an opportunity to be heard, and they are not individually parties to this record.

The General Assembly was evidently in grave doubt as to constitu- tionality of this tax as otherwise it would not have provided in section 19, "If any particular section of this act shall be held to be unconstitu- tional such holding shall not invalidate any other portion thereof."