GEORGE W. GRAY v. CENTRAL WAREHOUSE COMPANY ET AL.

(Filed 6 April, 1921.)

**1. Warehousemen— Tobacco— Public Sales— Public Interests— Court's Jurisdiction.**

Tobacco warehouses are "affected with a public interest," and the exclusion by the owners of the warehouse of one offering to sell or buy tobacco therein is unlawful.

**2. Same—Fraud—Misconduct—Exclusion of Seller.**

Should any seller or buyer misconduct himself by fake sales or purchases, or otherwise, this is a matter for prosecution in the courts. The warehouseman can not judge the matter and punish the offender by exclusion as a buyer or seller.

**3. Same—Equity—Injunction.**

Where a tobacco warehouse company has refused to receive the seller's tobacco for sale upon its warehouse floor, for "nesting" it, or so packing it as to deceive bidders and give them a false impression of its real value, an order restraining the warehousemen will be granted and continued to the hearing at the suit of the seller when the plaintiff has made out a *prima facie* case entitling him to the relief sought.

**4. Same—Boards of Trade—Rules and Regulations.**

While a board of trade of a town may make rules and regulations binding upon its members, and exclude persons from membership who violate them; this does not permit warehouses, by their rules and regulations, to exclude either as seller or buyer from their warehouse floors, any one because not a member of some prescribed organization.

HOKE and STACY, JJ., concurring in opinion upon grounds briefly outlined, and WALKER and ALLEN, JJ., concurring in result.

APPEAL by defendants from *Connor, J.*, at December Term, 1920, of LENOIR.

This is an action by George W. Gray, alleging that since 1914 he has been engaged in the business of buying tobacco sold on the floors of the tobacco warehouses located in Kinston, N. C., and up to 1920 had bought large quantities of tobacco, and that the buying of leaf tobacco upon warehouse floors is the principal business and occupation of the plaintiff, who has a license from the U. S. Government to buy leaf tobacco; that the persons, firms, and corporations named as defendants compose a voluntary association known as the Kinston Tobacco Board of Trade, which consists of several warehouses doing business respectively in said town as the Central Warehouse Company, Farmers Warehouse Company, Atlantic Warehouse, Knott Brothers Warehouse, Eagle Warehouse Company, and the New Brick Warehouse Company; that under a rule

of the said board of trade no person could buy tobacco on said warehouse floors unless he were a member of the Kinston Tobacco Board of Trade; that heretofore and up to 1920 the membership fee of the said Kinston Tobacco Board of Trade was $25, which sum was so small that any person desiring to buy tobacco could easily become a member of the board of trade with the right and privilege of buying tobacco, but on 23 August, 1920, the said board of trade, the plaintiff not being present and having no notice, adopted a rule fixing the membership fee at $500 and raising the annual dues from $18.50 to $49.50, and also adopted a rule that failure to pay within ten days after notice would forfeit membership. The plaintiff further averred that though a member of the board of trade he was not present at said meeting, and had no notice thereof, and the board of trade, composed of 34 members, increased the membership fee to $500, which was exorbitant and excessive, was intended to reduce competition among the buyers by limiting the number of competing bidders; that the dominant and controlling members of the said Kinston Board of Trade are the representatives of the Imperial Tobacco Company, Export Tobacco Company, Liggett & Myers Tobacco Company, and the American Tobacco Company, and the warehouses in said town, and that the purpose of the said tobacco companies was, by diminishing competition among buyers, to purchase the tobacco upon the warehouse floors at the lowest possible price with the result that said tobacco companies would obtain tobacco at a less price than it was reasonably worth, and in this way the tobacco growers in that section of the State are compelled to take less for their tobacco than the same is fairly worth, it being the purpose and object of said combination of manufacturers to purchase the tobacco at the lowest possible price by eliminating the independent buyer or reducing the strength and number of the independent buyers, and that for that purpose said companies gave notice through the President of the Kinston Tobacco Board of Trade, he being one of the buyers for the Export Tobacco Company, to each of the said warehouses that if any of the said warehouses accepted any bid from the plaintiff for tobacco on the said warehouse floor, then the said tobacco companies, *i. e.,* the Imperial Tobacco Company, the Export Tobacco Company, Liggett & Myers Tobacco Company, the American Tobacco Company, and the other companies above named, would withdraw their buyers from said market and the floors of said warehouse offending, and not buy any tobacco offered for sale thereon, and he avers that the reason assigned for refusing the plaintiff's membership which was that he had "nested" tobacco, was a pretext and he was found guilty without giving the plaintiff an opportunity to be heard or requesting him to give information though the charge was untrue and false; whereupon the plaintiff brought this action for damages to his

reputation and character and humiliation for such unjust expulsion, and denies that the defendants had the right to exclude him from buying on the floors of said warehouses, and asked for an injunction to compel them to accept bids made by him for tobacco sold upon their said warehouse floors, and deliver upon payment therefor. The defendants answered, denying some of the allegations and admitting others, and the court in its judgment granted an injunction to the hearing, finding as facts that "the defendants, Central Warehouse Company, Farmers Warehouse Company, Atlantic Warehouse Company, Knott Brothers Warehouse, Eagle Warehouse Company, and the New Brick Warehouse, are each and all public tobacco warehouses, doing business as warehousemen in the city of Kinston, and that each and every one of the said warehouses declined and refused to admit the plaintiff, George W. Gray, dealer in leaf tobacco, holding registration under United States statute, marked Exhibit 'A,' and filed in the record, to purchase or bid for tobacco upon the warehouse floors of the said respective warehouses for the reason that the said George W. Gray was not a member of the Kinston Tobacco Board of Trade, the plaintiff having been expelled upon the charge of nesting tobacco, and the court being of the opinion that the said defendant warehouses above named cannot refuse to permit plaintiff to bid whether the allegations of their answers are true or not," and restrained the above named warehouse companies and other persons named in the complaint from preventing "the said George W. Gray, the plaintiff, to bid for tobacco offered for sale upon the floors of the said respective warehouses at public auction, and to buy the same when his said bid is the highest bid therefor, and to deliver the same to him upon the payment therefor," and "consideration of the issues raised by the pleadings is continued to be heard and to be determined in due course and practice of this court and the cause is retained for further orders." From this order continuing this restraining order to the hearing the defendants appealed.

*Powers & Elliott and James S. Manning for plaintiff.*
*Cowper, Whitaker & Allen and Rouse & Rouse for defendants.*

CLARK, C. J. The only question presented is whether under the allegations of the complaint and admissions in the answer, and on the facts found by him, his Honor was justified in entering the order appealed from.

The Kinston Board of Trade is a voluntary organization, and they had the right to exclude or expel the plaintiff from membership therein with or without cause, and his Honor properly held that he did not pass upon that question, but inasmuch as the defendant warehouse companies

were operating their property "affected with the public use," he rightly held that they had no power to exclude the plaintiff from buying because he was or was not a member of that organization.

The plaintiff's cause of action is not because of his exclusion from the board of trade, but because he was forbidden to buy on the floor of the warehouses, and damages for such interference with his business and because of the humiliation and damages to his business by the publicity given to the allegation that he had been expelled for improper conduct. This raises issues of fact for the jury on the question of damages, and whether the allegation by the board of trade that he had been guilty of "nesting" tobacco was truthful or not. These issues were continued to the trial to be passed on by the jury. But the court held that whether he was a member of the board of trade or not did not entitle the defendants to exclude him as a buyer, and his Honor properly continued the order restraining the defendants from excluding the plaintiff as a buyer until the hearing. The order appealed from provides that "the plaintiff is to be accepted as a buyer only when his is the highest bid and on payment."

If any one applies to a railroad or a ferry for the transportation of himself or the carriage of freight, or to an inn-keeper, or sends his corn to a public mill, or his tobacco to a public warehouse, or applies to the owners of a gas or electric power plant, or any other business "affected with a public use," it has always been a principle of the common law, and never more necessary than now, that he is entitled to absolute impartiality as to the charges and treatment. If a passenger misconducts himself, those in charge of the train can put him off, and the same is true as to any other business affected with the public use. If in this case at the trial it shall be found that the plaintiff as a seller "nested" his tobacco it would prevent any recovery for damages on the charge of humiliation caused by the publicity given by the defendants in making public that matter, for the truth is a defense to libel. Whether, if true, such conduct authorized the defendants to exclude the plaintiff as a buyer is a matter which may come up on appeal from the verdict at the trial, but we hold that his Honor was eminently correct in holding that as long as that matter was undecided, the defendants had no power to exclude the plaintiff from being a buyer at their public sales, and the injunction until the hearing was properly granted.

In *Nash v. Page*, 80 Ky., 359, the duty imposed upon public warehousemen for sale of tobacco is thus summed up: "When a warehouseman for the public sale and purchase of tobacco undertakes to sell at auction and to conduct the business of a public warehouseman he assumes an obligation to serve the entire public. He has no right to select his own bidders, nor can he refuse to receive the tobacco of producers when

shipped to him. He can no more refuse to sell the tobacco of the producer at auction, or deny the right of any to bid when offered, than the owner of a stage or steamboat line may decline to take passengers or the owners of wine houses refuse to take the wine of others for storage. He cannot escape this obligation imposed by reason of the statute, and the common law by changing his appellation from public warehouseman to commission merchant." There is stated as authority for this the principles of the common law, "The sale of tobacco at auction at tobacco warehouses is a business affected with the public interest, and those carrying it on are under duties and obligations by common law to carry it on in a way that is reasonable and beneficial to the tobacco trade, and therefore they cannot discriminate or exclude buyers or sellers." This proposition is sustained by Cooley Const. Lim. (7 ed.), 870, et seq., and notes. The same subject is thoroughly discussed by Waite, Chief Justice, in Munn v. Illinois, 94 U. S., 125, where it is held that: "It has been customary in England from time immemorial, and in this country from its first colonization, to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, inn-keepers, etc., and in so doing to fix a maximum charge to be made for services rendered, accommodations furnished, and articles sold," and the doctrine is there traced back to Chief Justice Hale. It is there also stated that it was held to apply to warehouses in Aldnut v. Inglis, 12 East., 527.

The same statement as to the common law as to the many different businesses where property is affected with a public use forbidding discrimination in prices or otherwise, is to be found in Bacon's Abridgement, Wait's Actions and Defenses, and Aldnut v. Inglis, 12 East., 527 (already quoted), and Freund on Police Power, secs. 372-394.

In Head v. Mfg. Co., 113 U. S., 17, Munn v. Illinois was reaffirmed as to a water mill and mill-dam being affected with a public use, forbidding any discrimination as to the patrons or charges, and at pp. 17 and 18 are given the states which have by statute enlarged the common-law power in this respect, and among them this State.

One of the most informing decisions on this subject is Publishing Co. v. Asso. Press, 184 Ill., 438, which held: "The obligation of a corporation charged with a public interest does not arise from, nor rest upon, contracts made by it in conducting its business, but grows out of the fact that the corporation is discharging a public duty or private duty, which has been so conducted that it has become affected with a public interest."

To the same purport is S. v. Edwards, 86 N. C., 666, as to grist mills. In Brass v. N. Dak., 153 U. S., 391, the doctrine was applied to public warehouses and Munn v. Illinois was reaffirmed. It had already been reaffirmed as to elevators in Budd v. N. Y., 117 N. Y., 1, affirmed on writ of error, 143 U. S., 517.

The same principle as to all agencies "affected with a public use" was restated in *Mill Dam Corp. v. Newman,* 12 Pickering, 477; the same rule was applied to gas companies, *Shepard v. Gas Co.,* 6 Wis., 546; and to stock yards, *Chicago v. Rumpff,* 45 Ill., 90: to market houses, *Gale v. Kalamazoo,* 23 Mich., 345, 355, in a learned opinion by *Chief Justice Cooley.* That an auction house was held for public use was laid down in 70 E. C. L., 54.

The application of this doctrine to common carriers and other public utilities has been too often and too fully recognized to require any citations.

We have recently applied it to electric power companies, *Public Service Co. v. Power Co.,* 179 N. C., 18; *R. R. v. Power Co.,* 180 N. C., 422; *Griffin v. Water Co.,* 122 N. C., 208, and other cases.

Tobacco warehouses are public warehouses under the laws of North Carolina. Since 1895 the Legislature of North Carolina has regulated the warehouse charges, requiring that the tobacco shall be weighed by a person duly sworn; that every warehouse proprietor shall render to each seller of tobacco a bill of charges or fees for the same, and subjecting said proprietors to penalties for violations of the provisions of said statute. C. S., 5124, 5125, 5126; and since 1907 has required them to keep an account of the sales upon the floors and report the number of pounds sold each month to the Commissioner of Agriculture at Raleigh, who is required to keep record thereof and publish same in a bulletin, with penalty for failure to observe the statute both as to the warehouses and the Commissioner of Agriculture. C. S., 4926, 4927, 4928, 4929, 4930; and since then, Laws 1919, ch. 90, now C. S., 7839, requires that every tobacco warehouse shall take out a license, "Which shall be a personal privilege and shall not be transferable," specifying also the amount of tax and the duty of the Commissioner of Agriculture and the appointment of traveling auditors and making violations of the statute a misdemeanor, thus taking over the supervision of the business by the State.

Indeed, as far back as the history of the State extends the business of tobacco warehouses has been, if not a public duty, it has always been "affected with a public use." The laws of North Carolina from 1669 to 1790 have been compiled as State Records, Vols. XXIII, XXIV, and XXV, by the writer of this opinion, and in the index thereto, in the last named volume, it appears that no less than 75 statutes were enacted prior to 1790 in regard to tobacco warehouses requiring inspection, regulation, and fixing charges in such business. To the fullest extent, therefore, their regulation and control by the public has been recognized and enforced in this State.

In fact there is no subject in which the protection of the producers against extortion and combinations to reduce prices is more important. It appears from the official reports of the United States and State Governments that North Carolina in 1919 was the fourth State in the Union in the value of its agricultural products, coming after Illinois, Iowa, and Texas only. In that year the cotton crop of this State was 857,000 bales, bringing approximately $154,000,000 at the current price of 36 cents; the tobacco crop for the same year was 326 million pounds, bringing, at an average price of 50 cents, $163,000,000, being in excess of the value of the cotton crop of the State. In 1920, according to the Government and State reports, the cotton crop of the State was 936,000 bales, which at 15 cents brought only approximately $70,200,000, while the tobacco crop of 421 million pounds (in which North Carolina led all the other States) at an average price of 21½ cents brought in $90,515,-000. It thus appears that the tobacco crop of the State exceeds in value even the cotton crop, and whether the charge is true or not that the excessive reduction in the price of tobacco was caused by combinations among the largest buyers, it is easy to see that if the conduct of warehouses is left to their owners, and either on their own motion or upon pressure from the large tobacco manufacturing companies they can exclude nay one from being a buyer either upon the charge of some previous moral delinquency, especially before conviction in court, or by requiring buyers to become members of a board of trade at high cost, or in any other manner, the result will be to place the tobacco farmers of the State absolutely at the mercy of these gigantic corporations, and would reduce the farmers, while nominally owners of their land, to become in reality mere tenants at will of these great monopolies, and practically peasants. The entire history of the State, and the statutes on this subject, as well as our present statutes, place the regulation of tobacco warehouses not under private control as defendants have assumed in this case, but under the control of the public authority. If they can exclude any one from being a buyer, upon one pretext or reason, they could do so upon any other, but being public warehouses they cannot forbid any one to be a buyer or seller any more than a *quasi*-public corporation, like a railroad, could refuse any one from being a shipper or a traveler over their lines upon an allegation of moral delinquency or failure to belong to some prescribed association. The matter, however, does not need discussion, as it has been fully decided.

In *Nash v. Page,* 44 Am. Rep.; *S. c.,* 80 Ky., 539, it is held: "One who assumes to carry on the business of a public warehouse for the purchase of tobacco and the public sale thereof at auction is bound to serve as such without discrimination, and cannot select bidders nor reject any producers." In the course of that opinion the Court says: "Since the

formation of the State Government, the sale of this great staple has been fostered and protected by legislation. The rights and duties of the warehousemen, the buyers and sellers, and all the officers connected with the warehouses, have been defined by statute, and no other commodity has received the same protection in the way of either general or special legislation. Nine-tenths of the tobacco is sold at auction, with the right unquestioned, until the present controversy, of all parties to enter the warehouse as buyers or as sellers, by their warehousemen as their agents, and competition left unrestricted, save the option on the part of the owner to approve or reject the bid. There is no provision, it is true, in any of the statutes now in force, or that existed prior to the law as we now find it, compelling the producer of tobacco to take it to the warehouses in the city of Louisville, or to expose it for sale at public auction; but such warehouses have been always regulated by law for the benefit of the producer, as well as those who are the proprietors of these warehouses, and the latter have assumed an obligation to the public that exists so long as they continue public warehousemen. They have assumed a *quasi*-public character under the protection of the law, and will not be allowed to exercise all the privileges that have heretofore belonged to warehousemen, and evade all the duties and responsibilities of their position by the passage of a resolution disclaiming that they are operating their houses in the capacity of warehousemen, but as commission merchants."

This opinion from Kentucky, which is second only to this State in the production of tobacco, further says: "The case of *Munn v. Illinois,* 94 U. S., 113, bears directly upon the question raised in this case. In that case it was claimed that the exercise of the legislative power of the State of Illinois was in violation of the Constitution of the United States in attempting to regulate by statute the maximum charges for the storage of grain in warehouses at Chicago and other places in the State, in which grain is stored in bulk, and the grain of different owners mingled together. The right of private property, and to deal and trade as these warehousemen might see proper with those who applied to them to store their grain, was insisted upon in that case; but it was there held by *Waite, C. J.,* quoting Sir Matthew Hale in England, that 'property becomes clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he in effect grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to the control.' There is manifest distinction between the man-

ner in which the business of selling tobacco at these warehouses is conducted and that of those who are engaged in the ordinary business of commission merchants. These warehousemen now have, and always did have, in this State, public duties to perform, and to attempt to control by legislation the ordinary business of mercantile establishments in the same manner as the duties of these warehousemen are defined and regulated, would be in violation of both the Federal and State Constitutions. If the fourteen warehouses in Chicago can be regulated in their charges because of their relation to the public, the ten warehouses in the city of Louisville can be regulated in the same manner, and because the statute of this State is more liberal in its provisions toward the owners of these public warehouses than that of the State of Illinois is no argument in favor of the right of the appellants to relieve themselves of the duty they owe the public. It is conceded fact that more than five millions in value annually find its way from the producer to the warehouses in that city. The great part of this product is grown within the State, and the producer almost of necessity is compelled to place his tobacco under the control of and for sale by these several warehousemen at public auction. All this tobacco must necessarily pass through these warehouses, subject to such charges as are reasonable and proper, and to say that the proprietors, with such relations to the public, can forbid buyers to enter their auction room, and to deny to any but members of the board of trade or applicants for membership the right to make purchases, is a palpable disregard of the duty they owe to the individual patrons as well as to the public, and in the absence of any statute, is in violation of the rule of the common law. Such a public duty may be imposed on these warehousemen in express terms or by implication, but whether so imposed or not, it arises from the facts of this case. This doctrine has been discussed and in effect settled long before the rule established in *Munn v. Illinois,* and upon the doctrine of the common law in reference to common carriers, such as steamboats, railroads, express companies, stage lines, warehouses, etc. If a public warehouseman can refuse to sell the tobacco of the producer at auction, or deny the right of any one to bid for it when offered but those whom he selects or permits to bid, why may not the owner of a steamboat or stage line, without excuse, decline to take the passenger, or the owner of the wine warehouse to receive the wine of others on storage? The steamboat is the private property of the owner; but he has engaged in a public employment, and so is the warehouseman, although not of the same character; but the undertaking of each is affected with the public interest, and for that reason the steamboat is compelled to take freight and passengers, and the warehousemen to receive and store and sell at auction the tobacco of the owner, and all are allowed to enter and compete as bidders."

GRAY *v.* WAREHOUSE CO.

A public warehouse company cannot discriminate by rejecting any one as seller or buyer. This is an obligation imposed on public warehousemen both by common law as well as by statute, 40 Cyc., 404; 27 R. C. L.; 951. Up until *Munn v. Illinois,* 94 U. S., 113, the railroads contested the right of the Government to fix their rates, prescribe their schedules, or otherwise regulate their operations, but that case settled the contest in favor of the public and since then regulation has been extended and it is now undisputed. An examination of that case will show that the doctrine was derived by analogy from the common-law right to regulate ferries, common carriers, hackmen, bakers, millers, wharfingers, innkeepers, and the like; to regulate their charges, prescribe the accommodation to be furnished, and the articles to be sold, and, above all, the prohibition of any discrimination in the facilities to be furnished to all alike and the charges to be made.

The correctness of his Honor's continuance of the injunction is no wise affected, as he properly held, by the consideration whether the plaintiff was justly expelled from the board of trade or not, and it is not a matter of consideration, even at the trial, except upon the issue as to damages for the humiliation caused by making the charge public if it was untrue. The injunction was continued for the valid reason that the defendants could not exclude him from being a buyer because he was not a member of the board of trade, which is entirely independent upon his having been properly excluded or not. The injunction was continued upon the ground that the warehouses being affected with a public use the owners could not require any discrimination by rejecting those who were not members of a certain organization, or requiring that such bidders should have paid a specified sum before they could join that organization, which would be a further hindrance to a numerous body of buyers. It is to the public interest that buying shall be a privilege open to all the public. If the warehouse owners could require that the bidder must belong to a board of trade to entitle him to be a buyer they could require that he should belong to any other organization or be a member of any church that they might designate. If they could require him to pay $500 to become a buyer, they could require him to pay $5,000. In short, if the public warehouses could make any requirements which are a discrimination they could so narrow and so restrict the number of buyers that the competition would amount to nothing, and the farmers who raise and offer tobacco for sale would be compelled to take whatever was offered. In this lies the vital importance of this principle of the common law in its application to this case, and all other cases of public utilities or where private property is "affected by a public use."

GRAY v. WAREHOUSE CO.

Many principles of the common law have been eliminated or modified by the experience of the ages, with the advance of civilization, but those that have stood this test have preservèd the standing of the common law as the foundation of much of our liberty. Among these last there is no principle more important to the public welfare than to preserve to every individual, however humble, the right that in dealing with public utilities and businesses "affected with a public use," there can be no discrimination against any individual in regard to uniformity of charges and impartial treatment. This principle is more important now than ever, and has been widened and not restricted by the courts and by statute. Its assertion by every one is as commendable (and even more necessary to the public welfare) as the resistance of Hampden to the collection of ship money or of the Colonists to the Stamp Tax. In this particular matter we know that the great tobacco companies have been exceedingly profitable, and that their methods were declared illegal by the Supreme Court of the United States by an unanimous opinion, U. S. v. American Tobacco Co., 221 U. S., 106, quoted in Public Service Co. v. Power Co., 179 N. C., 32-38. One of them, upon a capital beginning with $350,000, gathered in a very few years an aggregation of $350,000,000, in addition to heavy dividends all along, being $1,000 collected from the public for every $ the owners of the company had put into the business; and we know that even now more than one of them has been recently declaring 200 per cent dividends and more, while at the same time those who produced the tobacco are in the direst straits, in many instances not being able to defray even the expenses for the cultivation, and the fertilizer, for their product. If the tobacco warehouses can make discrimination of the kind used against this plaintiff, the producers of tobacco are henceforth hopelessly and absolutely in the power of these great corporations who control the warehouses, and can prescribe, as in this case, regulations that will rule out "independent" buyers and prevent the organization of small competing companies.

In the early history of this State, as set out in the compilation of our early laws, 23, 24, and 25 State Records, the tobacco warehouses were operated under State ownership. The present regulation is that of supervision of a business "affected with the public use." Should any seller or buyer misconduct himself as by fake sales or fake purchases or otherwise, his conduct is a matter to be settled by prosecution for disorderly conduct or other misdemeanor in the courts. The public warehouseman himself has no such power, and cannot punish him by prohibiting any seller or buyer from taking part in the sales conducted in said warehouse. To permit this would be to lay wide open the road to the exercise of an undue restriction upon trade, which, always forbidden by the common law, is now indictable under both State and Fed-

eral laws. Whether in this case there has been a combination attempted to restrict the number of buyers is a matter which can be settled only by proceedings under the State or Federal statutes, and is not before us.

This matter has been too often discussed, and is too fully settled to require an extension of this discussion. In *Munn v. Illinois, supra,* the question was the application of the principles of the common law to elevators which had a monopoly of the grain business as the public warehouses have in this State a monopoly of the sales of tobacco, and if the warehouses in Kinston can exclude any one, at their will, from buying or selling, all could do so. It is not necessary that there should be statutes regulating, on the part of the public, the conduct of these public warehouses further than the common law or the statutes have already done. It is sufficient to say that those operating them cannot impose rules or regulations which will exclude any one from selling or buying thereon equally with every one else, and on the same terms. They cannot make different charges to any one, nor exclude any one.

This action is brought for damages. The allegations that the plaintiff's expulsion was upon an unjust and unproven charge of misconduct, causing humiliation, and that being prevented from buying has caused him pecuniary loss in his business and humiliation, are denied, and are issues of fact to be settled by the jury at the trial. The judge, however, properly granted an injunction against restraining the plaintiff from being a buyer on the floor of any warehouse operated by the defendants, and in doing so he has rendered a distinct service not only to the largest agricultural interest in the State, but to the State at large.

The defendants rely upon *Godwin v. Tel. Co.,* 136 N. C., 258, where the Court upheld the refusal of an application for mandamus to place a telephone in a house where unlawful business was carried on, if an aid in carrying on the illegal business, but otherwise the corporation could not refuse the applicant. The Court in that case was careful to say that while a common carrier was not required to carry a passenger to aid in an illegal escape, or to do an illegal act, it could not refuse to convey him because he had done an illegal act. In this case the buying by the plaintiff was a perfectly lawful act in which any one was entitled to share, especially one who held, as the plaintiff did, a Federal license. The defendants could not reject or refuse any one the right to sell or to buy at a public warehouse sale or require any qualification such as membership in a board of trade or any other that would not be valid if required by a public mill or a common carrier. It is true a railroad company is a *quasi*-public corporation, and a telephone company is a public utility, but a public warehouse is at least "affected by a public use," like public mills, inn-keepers, and others. It is not necessary that there shall be statutory regulations, but it is essential that there shall

not be regulations by those operating public utilities or business "affected by the public use" which will permit discrimination against any one. These requirements are based upon the principle, *"Salus populi suprema est lex"; that is,* that *the public welfare is the highest law.*

The question here presented is one of the utmost importance, not only because it presents a principle that has been recognized as settled law for centuries, but because of its great importance from a Politico-Economic standpoint, and that proposition is that public utilities, and wherever private property, by the nature of its employment, has become "affected with a public use," the owners thereof cannot discriminate as to charges or treatment of the public, who are, from the nature of the business, invited to make use thereof. There is probably no principle of the law whose maintenance in its integrity is more important to the welfare of the public than this, or whose disregard will bring greater disaster.

Government is instituted for the protection of all men and all legitimate businesses, especially the weak against the strong. One buyer could not successfully contend against a combination of buyers, or of the owners of the warehouses, which is the only place where tobacco can be sold or bought, and to permit discrimination would be to place this great agricultural industry in the absolute power of any combination, which, by reducing the number of buyers and admitting only those acceptable to great combinations, would place the producers of tobacco at their mercy.

For the same purpose of protecting the producer in the sale of the cotton crop, the General Assembly enacted the Cotton Warehouse Act, Laws 1919, ch. 168, now C. S., 4907-4925, which was held valid. *Bickett v. Tax Commission,* 177 N. C., 433.

Affirmed.

HOKE, J., concurring: I concur in the disposition made of this appeal by which the injunction is continued to the hearing, and in the opinion that these warehouses dedicated by the owners or management to the public marketing of tobacco are affected with a public use and interest so as to become the subject of reasonable public regulations. And I am inclined to the opinion that the regulations now established by the Kinston Tobacco Board, as to the selection and qualification of these buyers, may be too restrictive. Reserving final decision on that question, however, until the facts are more fully disclosed at the hearing, I am of opinion further that subject to such reasonable rules and regulations as may be established by the public agencies, and when not interfering with same, the authorities in control and management of these warehouses have the power to establish for themselves such reasonable

rules and regulations as may be required to promote business efficiency and insure fair and honest dealing in the transactions occurring there, and the same may extend to the exclusion of an individual buyer or seller who has been properly shown to be guilty of dishonest practices on the warehouse floor, and such as tend to destroy the confidence of the public and patrons in the integrity of their management, and of the business methods under their supervision and control. On perusal of the record, it is alleged in the answer of defendants, and duly verified, that the plaintiff, who had been a member of the board of trade, privileged to sell and buy in these warehouses after a full and impartial hearing had been found guilty of "nesting tobacco" at one of these warehouse sales, this being a practice by which the tobacco offered for sale is so packed as to deceive bidders and give a false impression of its value, and that he was expelled from his membership and excluded from buying for that reason and pursuant to a rule to that effect established by the governing board. If these allegations should be established on the hearing, whatever may be the rights of the public and patrons generally, I am of the opinion that the present claimant, as an individual buyer, has been properly excluded, and I am well assured that no court should lend its aid to restore him to a participation in the warehouse privileges. Public policy requiring that these warehouse sales should be kept free from unreasonable restrictions, and the pertinent facts being in dispute, I think plaintiff *prima facie* has the right to take part and have his bids duly considered, and that his position should be maintained to the hearing. *Tise v. Whitaker,* 144 N. C., 508; *Cobb v. Clegg,* 137 N. C., 153. But there being material issues raised on the pleadings, which may affect both the question of liability and the amount of damages, I am of the opinion that the order must be without prejudice, and subject to the determination of these issues at the final hearing. Although this may be to some extent in the nature of a mandatory injunction, the authorities hold that a preliminary order is at times permissible in such cases, and I think this course should be pursued in the present instance. *Keys v. Alligood,* 178 N. C., 16; High on Injunctions (4 ed.), sec. 4.

STACY, J., concurring: I think the plaintiff *prima facie* is entitled to the privileges of a buyer upon the warehouse floors of the defendants, which have been dedicated to the public marketing of tobacco. I am also of the opinion that the regulation fixing membership in the Kinston Board of Trade as a prerequisite to the privilege of buying at such warehouses is unreasonable and void. However, the duty which the defendants owe to the public of maintaining a free and open market is coequal with their obligation to support and promote the principles of honesty, integrity, and fair dealing in their business. Both affect the public

interest. Hence, it appearing that material issues are raised by the pleadings, which may bear upon the question of liability as well as the issue of damages, I concur in the result, and agree that the restraining order should be continued without prejudice and subject to the determination of these pertinent issues at the final hearing.

WALKER and ALLEN, JJ., concur in result upon the ground that the case ought to be more fully developed, and the issues raised by the pleadings determined before an expression of opinion on the legal questions discussed before us.