Nash, &c., v. Page, &c.

CASE 100—EQUITY—DECEMBER 14, 1882.

# Nash, &c., v. Page, &c.

APPEAL FROM LOUISVILLE CHANCERY COURT.

| 80 | 539 |
|----|-----|
| 91 | 343 |
| 80 | 539 |
| 92 | 322 |
| 80 | 539 |
| 98 | 164 |
| 80 | 539 |
| 106 | 173 |
| 80 | 539 |
| 113 | 683 |
| 80 | 539 |
| e133 | 804 |

1. When a warehouseman for the public sale and purchase of tobacco undertakes to sell at auction, and to conduct the business of a public warehouseman, he assumes an obligation to serve the entire public.
2. He has no right to select his own bidders, nor can he refuse to receive the tobacco of the producer when shipped to him.
3. He can no more refuse to sell the tobacco of the producer at auction, or deny the right of any to bid for it when offered, than the owner of a stage or steamboat line may decline to take passengers, or the owner of wine-houses refuse to receive the wine of others on storage.
4. He cannot escape the obligation imposed by the reason of the statute and the common law, by changing his appellation from warehouseman to commission merchant.
5. Both parties were in fault, and therefore the injunction was improperly granted.

BROWN & DAVIE AND A. BARNETT FOR APPELLANTS.

1. The selling of tobacco at auction at tobacco warehouses is a business affecting the public interests, and appellees, in carrying it on, are under duties and obligations, by common law and by statute, to carry it on in a way that is reasonable and beneficial to the tobacco trade, and therefore they cannot discriminate or exclude buyers or sellers, except on reasonable grounds. (1 Bl. Com., 138; 37 Iowa,

Nash, &c., v. Page, &c.

145; 10 Met., Mass., 475; 12 Pick., 477; 12 Cushing, 477; 1 Daly, 547; 62 Maine, 214; 6 Wis., 546; 12 East., 527; 69 Ill., 91; 4 Otto, 125; 70 N. Y., 570; 30 Ohio, 616; 45 Ill., 90; 23 Mich., 355; 17 Wallace, 382; Act March 12, 1870; *Ib.*, January 2, 1852; Acts 1851–'2; Act 1865; Story on Agency, sec. 27; 3 Bush, 621; Ambler's Rep., 496; 6 C. & P., 239; 70 Eng. Com. L. R., 54; 102 *Ib.*, 316; 2 Morehead & Brown's Stat., pp. 830 to 851; Acts 1869–'70, vol. 1, 86; 6 Whart., 295; Gen. Stat., 557; 4 Otto, 162; Lane v. Kasey, 1 Met., 414; Cooley's Const. Lim., 572; Dillon on Corp., 93; 5 Bush, 560; 8 Bush, 417; 61 Barb., 539; *in re* Marriott, 87 Eng. Com. L. Rep., 513; Cooley on Torts, 280; 68 Penn. St., 186; 17 Ohio, 190; 6 Ell. & Bl., 73; 6 Mann & Grang., 205; 39 N. H., 183; 7 Eq., 492; 5 Wall., 74.)

2. Whether appellees are "affected with a public interest" by law or by their own advertisements, or whether they be considered as engaged in a strictly private pursuit, the right of appellant to an injunction is equally clear.

J. F. BULLITT, ISAAC CALDWELL, AND W. LINDSAY FOR APPELLEES.

1. Appellants were members of the tobacco board of trade, and chose to secede from it without any sufficient reason. The "rebellion" was a violation of their own agreement, as contained in the articles of incorporation.

2. Whether a valid corporation or not, it is their agreement. Their secession was unreasonable, and their determination, as expressed in their paper of April 19, 1879, not to buy any tobacco at auction or private sale from appellees' warehouses until concessions were made to them, placed them beyond the protection of a court of equity.

3. The court below properly dissolved their injunction. (Session Acts 1869–'70, p. 86; 3 East., 205; 6 Bacon's Ab., title Statute, letter D; 1 Bland., 165; 6 Wharton, 295; Cooley on Torts, 278; 1 Ld. Raymond, 374; 1 Dev. & Batt., 44; 14 Allen, 499; 34 Md., 407; Cropper v. Keating, 3 Common Pleas, 200.)

JUDGE PRYOR DELIVERED THE OPINION OF THE COURT.

This is a controversy between the proprietors of ten of the tobacco warehouses in the city of Louisville and the appellants (twenty-seven in number), who are large dealers in tobacco, and licensed by the United States and the city government, with authority to purchase and sell leaf and manufactured tobacco.

It seems that these appellants were denied the right to make purchases of tobacco at the warehouses of which the

defendants are the proprietors, and they applied to the chancellor for an injunction, asking that these *warehousemen* be enjoined from refusing them permission to make purchases at their several warehouses, and from rejecting their purchases when making the highest and best bids for the tobacco offered, upon the payment of such fees as are charged to other buyers.

The appellants, or the most of them, are large dealers in tobacco, buying, as the record shows, two-thirds or more of the tobacco offered in the Louisville market; and becoming dissatisfied with the warehouse fees charged to them as buyers, they, together with other members of what is known as the *Tobacco Board of Trade*, demanded of the warehousemen a reduction of the fees from $2 to $1.25 per hogshead, with four months' free storage, and forty cents a month storage thereafter.   This proposition or demand was rejected by the warehousemen, and on April the 18th, 1879, *the appellants met and resolved, on and after the first Tuesday in May, not to purchase tobacco from these warehouses, at auction or otherwise, and also withdrew their membership from the board of trade.* A new warehouse was opened about, or shortly after, this time by Schwartz and Johnson, and this house charged much less than the old warehouses were charging for either selling or storing tobacco.   About the 1st of July, 1879, the board of trade adopted *a by-law by which warehousemen, who were members of the board of trade, were prohibited from selling tobacco, publicly or privately, to any but members of the board, or to applicants for membership, and the members were also prohibited from buying at any warehouse in the city, the proprietors of which were not members.*   For a violation of this by-law they were subject to expulsion from the board.

On the 10th of February, 1872, the proprietors of these warehouses, or the most of them, said to their patrons and the public, in a publication made, *that they had closed their respective tobacco warehouses, and withdrawn from working under the law as it then existed, and would, on the Monday following, open as commission merchants for the sale of tobacco, cotton, and other products of the soil, the fees for selling tobacco the same as heretofore, and for other products the customary commissions, &c.*

After the resolution passed by the appellants that they would not purchase tobacco at the warehouses owned by the defendants, and the resolution adopted by the defendants (appellees) prohibiting them from purchasing, the appellants, ascertaining that the new house, known as the Enterprise, could not furnish enough tobacco to supply their wants, offered to purchase of the appellees, and were denied the right, and hence this action. This, in substance, is the history of the controversy, as given by the chancellor, and verified by the record before us. It is a matter of history, and also a fact appearing from this record, that the tobacco trade in the city of Louisville is very large, the annual sales approximating in value six million of dollars, and the trade constantly increasing.

Since the formation of the state government, the sale of this great staple has been fostered and protected by legislation. The rights and duties of the warehousemen, the buyers and sellers, and all the officers connected with the warehouses, have been defined by statute, and no commodity has received the same protection in the way of either general or special legislation. Nine tenths of the tobacco is sold at auction, with the right unquestioned, until the present controversy, of all parties to enter the warehouses as buyers or

Nash, &c., v. Page, &c.

as sellers, by their warehousemen as their agents, and competition left unrestricted, save the option on the part of the owner to approve or reject the bid. There is no provision, it is true, in any of the statutes now in force, or that existed prior to the law as we now find it, compelling the producer of tobacco to take it to the warehouses in the city of Louisville, or to expose it for sale at public auction; but such *warehouses* have been always regulated by law for the benefit of the producer, as well as those who are the proprietors of these warehouses, and the latter have assumed an obligation to the public that exists so long as they continue public *warehousemen*. They have assumed a *quasi* public character under the protection of the law, and will not be allowed to exercise all the privileges that have heretofore belonged to *warehousemen*, and evade all the duties and responsibilities of their position by the passage of a resolution *disclaiming* that they are operating their houses in the capacity of *warehousemen, but as commission merchants*.

They pursue the same business, without any change as to the manner of selling or of conducting their warehouses, claiming only the exercise of a private right, and an entire exemption from the discharge of a public duty. Can this be done; and is the producer at the mercy of a board of trade claiming, regardless of the law for the protection of this great interest, the right to exclude from the warehouses of the city all persons who offer themselves as buyers because they are not members of that board? and to go further, if they see proper, and refuse to receive or sell at auction the tobacco shipped to their houses by the owner or producer? If they are to be regarded as *commission* merchants only, they can exercise such a right.

"It is a part of every man's civil rights that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public or third persons have any legal concern." (Cooley on Torts, 278.)

This is a safe rule, and a court, in discriminating between what are public and what are private rights or duties, should be careful not to restrict the citizen in the exercise of a right that permits him to buy and sell when and to whom he pleases, if not in violation of the law of the land; but if, in the exercise of a private right, the citizen assumes a public duty, there is no reason why he should be permitted, at his own will and pleasure, to say that the private right exists, but the obligation to the public is abandoned: I am, in fact, a public *warehouseman* for the sale of tobacco, but in name I am a commission merchant. That the producer may sell his own tobacco, or appoint an agent for that purpose, there can be no doubt, and if a commission merchant, it does not affect his right to sell; but when he undertakes to sell at *public auction*, and to conduct the business as a public *warehouseman*, he assumes an obligation to serve the entire public, and has no right to select his own bidders, or to refuse to receive the tobacco of the producer when shipped to him. This obligation exists not only by reason of the statute, but under the rule of the common law. We perceive no difference between this character of warehouse and that of wine *warehouses* or grain *warehouses;* and the rule applied to the latter required them to discharge the duty of receiving the wine and grain shipped to them by the owner. This is the first time in the history of the state that warehousemen, controlled and regulated in their

business by legislation, have asserted their right to select their customers, including both the producer and the buyer; and the custom heretofore existing, sanctioned by the rule of the common law, would, of itself, deny the right claimed by the appellees in this case. A railroad company, regulated by the provisions of its charter, undertakes to carry freight and passengers. Such a corporation is permitted to acquire property in depot buildings, omnibuses, and in all/ things else necessary for the proper and safe transportation of freight and passengers. It has assumed a public duty for the purpose of advancing private interests, and, as was decided *in re* Marriott, English Common Law Reports, 513, such a corporation had no right to say, through its agent, to the owner of an omnibus: You cannot come to this dêpòt for passengers; we furnish our own conveyances, or have already omnibuses employed sufficient in number to carry passengers. The court held that the corporation was bound to admit the omnibus company to its dêpòt to solicit passengers, on the ground that the railroad was a public servant. So in this case, while the warehouse is the private property of the owner, it has been devoted to a public use, and is controlled and regulated in the conduct of its business for the protection of this great interest. It is not an insurer like a common carrier, and subject to the same liability, but it assumes all the liabilities pertaining to kindred employments.

The case of Mum v. The State of Illinois, reported in 4th Otto, bears directly upon the question raised in this case. In that case it was claimed that the exercise of the legislative power of the State of Illinois was in violation of the Constitution of the United States in attempting to regu-

late by statute the maximum charges for the storage of grain in warehouses at Chicago and other places in the state in which grain is stored in bulk, and the grain of different owners mingled together. The right of private property, and to deal and trade as these warehousemen might see proper with those who applied to them to store their grain, was insisted upon in that case; but it was there held that "property does become clothed with a public interest when used in a manner to make it of public consequence, and affect the community at large. When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good to the extent of the interest he has thus created. He may withdraw his grant by discontinuing the use, but so long as he maintains the use, he must submit to the control." There is a manifest distinction between the manner in which the business of selling tobacco at these warehouses is conducted and those who are engaged in the ordinary business of commission merchants. These warehousemen now have, and always did have, in this state, public duties to perform, and to attempt to control by legislation the ordinary business of mercantile establishments in the same manner as the duties of these warehousemen are defined and regulated, would be in violation of both the federal and state constitutions. If the fourteen warehouses in Chicago can be regulated in their charges because of their relation to the public, the ten warehouses in the city of Louisville can be regulated in the same manner, and because the statute of this state is more liberal in its provisions towards the owners of these public warehouses than that of the state of Illinois is no argument in

favor of the right of the appellants to relieve themselves of
the duty they owe to the public. It is a conceded fact
that more than five millions in value of tobacco annually
find its way from the producer to the warehouses in that
city. The greater part of this product is grown within the
state, and the producer almost of necessity compelled to
place his tobacco under the control of and for sale by these
several warehousemen at public auction. /All this tobacco
must necessarily pass through these warehouses, subject to
such charges as are reasonable and proper, and to say that
the proprietors, with such relations to the public, can forbid
buyers to enter their auction room, and deny to any but
members of the board of trade or applicants for member-
ship the right to make purchases, is a palpable disregard of
the duty they owe to the individual patron as well as to the
public, and, in the absence of any statute, is in violation of
the rule of the common law. Such a public duty may be
imposed on these warehousemen in express terms or by im-
plication, but whether so imposed or not, it arises from the
facts of this case. /This doctrine had been discussed, and
in effect settled, long before the rule established in the case
of Mum v. The State of Illinois, and upon the doctrine of
the common law in reference to common carriers, such as
steamboats, railroads, express companies, stage lines, ware-
houses, &c. If a public warehouseman can refuse to sell
the tobacco of the producer at auction, or deny the right of
any to bid for it when offered but those whom he selects or
permits to bid, why may not the owner of a steamboat or
stage line, without excuse, decline to take the passenger, or
the owner of the wine warehouse to receive the wine of
others on storage? The steamboat is the private property
of the owner; but he has engaged in a public employment,

and so is the warehouseman, although not of the same character; but the undertaking of each is affected with a public interest, and for that reason the steamboat is compelled to take freight and passengers, and the warehousemen to receive and store and sell at auction the tobacco of the owner, and all are allowed to enter and compete as bidders.

Lord Hale says: "If one owns the soil and landing-places on both sides of a stream he cannot use them for the purposes of a public ferry, except upon such terms and conditions as the body-politic may, from time to time, impose, and this because the common good requires that all public ways shall be under the control of the public authorities. This privilege or prerogative of the king, who, in this connection, only represents and gives another name to the body-politic, is not pecuniarily for his profit, but for the protection of the people and the general welfare; and further, when private property is affected with a public interest, it ceases to be *juris privati* only." And further, "When the king or a subject have a public wharf to which all persons must come who come to that port to unlade their goods, either because they are the wharves only licensed by the queen, or because there is no other wharf in that port, in that case there cannot be taken arbitrary and excessive duties, but the duties must be reasonable and moderate, though settled by the king's license or charter."

Lord Ellenborough said, in Allnutt v. Ingles, 12 East., in discussing the rights of the proprietor of a wine warehouse: "If other warehouses were licensed in other hands, it would not cease to be a monopoly of the privileges of bonding there, if the right of the public were still narrowed and restricted to bond their goods in those particular warehouses,

though they might be in the hands of one or two others besides the companies."

These warehouses are invested with the monopoly of a public privilege, and made so as a matter of necessity, and this authorizes the exercise of legislative power over them for the public welfare. The exercise of such a power we understand not to be questioned in argument; or, if so, we think the right too well settled to admit of controversy. The producer of tobacco is restricted, necessarily, to these warehouses in order to have it sold, and to obtain the best market price by competition in bidding. We do not mean to say that the owner could not ship it to New York or to Liverpool, or sell it on his way to market, but that in this great tobacco center the producer is restricted to these public warehouses, or rather, that these public warehouses have a mutual monopoly of the sales of tobacco at auction, and the fact that there is more than one or a dozen such warehouses cannot affect the question.

The act, entitled "An act to regulate the sale of leaf tobacco in this Commonwealth by *warehousemen* and commission merchants and tobacco dealers on commission," provides that hereafter commission merchants shall have the tobacco weighed before and after cooperage, and both weights recorded, and the owner to be paid according to the highest weight after deducting the exact tare. It provides penalties for the act, but fails to make any provision as to the fees whatever. This liberal legislation towards the public warehousemen or commission merchants does not alter the rule of law applicable to the question raised here.

If called commission merchants, they are nevertheless public warehousemen, and if the character of their business is that of a public employment such as makes them subject

in their charges and mode of conducting. it to legislative regulation and control, they are public servants, and cannot be said to be engaged only in ordinary business pursuits.

The doctrine that every one should be allowed to manage his own property and his own business in his own way must have some qualification. Our relation to others must, in many instances at least, determine what our rights are, "and when one sustains such a relation to the public, by reason of his public employment or calling, that the people must of necessity deal with him, then he must so use his property and calling as not to injure others; and therefore, when these *warehousemen* undertake to dispose of nearly the entire tobacco product of the state at public auction, and when the producer and buyer are not only invited, but, we may say, compelled, to patronize these warehouses that their tobacco may be sold, and the wants of the purchaser supplied, it would be violating every rule of fair dealing to adjudge that the warehouseman shall determine for himself whose tobacco he will sell, and, when offered for sale, what man or set of men shall compete as bidders. Such a doctrine is in violation of the duty the warehouseman owes to the public, a disregard of the statutory regulation of the state on the subject, and opposed to the rule of the common law.

We cannot, therefore, concur with the chancellor below in the conclusion reached upon this branch of the case, and the remaining inquiry will be directed to the position occupied by the appellants in this case, with a view of ascertaining whether the chancellor should interpose by injunction in their behalf. They were members of the board of trade by which the prices for the sale and storage of tobacco were fixed. They complained that the warehousemen were

charging them as buyers more than was proper; that $1.25
per hogshead was a sufficient charge, while they were re-
quiring them to pay $2 per hogshead.   The warehousemen
rejecting their proposal, they resolved in a body not to buy
any tobacco at auction or private sale, directly or indirectly,
from any of the warehouses until they should accede to
their demand for a reduction of the fees, and withdrew
from the board of trade.  Here there was a disagreement
with the members of the same board, and appellants were
attempting to compel the other members to reduce the fees
for the purpose of advancing their own interests as buyers.
They were violating the rules of the board not for the pub-
lic good, but for individual gain, and notified the appellees
of the agreement made among themselves not to purchase
longer at their warehouses, and when this was done, the pro-
prietors of the warehouses resolved that they would not per-
mit them to sell or buy in their warehouses.   The appellants
claim the right to resolve not to deal with these warehouse-
men, but deny to the warehousemen the right to prohibit
them from purchasing at their auction sales.   We have
already adjudged that all have the right, upon the payment
of reasonable fees and charges, to enter these public ware-
houses for the purpose of having their tobacco sold, or to
compete in the bidding, nor do we determine that such a
right does not belong to the appellants; but while this right
exists, it does not follow that the chancellor will undertake
to grant relief by injunction where the one party is as much
in fault as the other.   If the proprietors of these ware-
houses had the right to charge the fees, and this is not
denied, while the appellants might claim that the charges
were too high, still, as members of the same board, they
had no legal or equitable right to compel a compliance with

.their demands on the part of the other members by refus-
:ing to enter the warehouses or remain longer in the organi-
·zation unless their demands were acceded to. It is true
they now say they will bid at their sales, and have offered
to make purchases, and the principal reason assigned is that
the Enterprise house is not selling a sufficient quantity of to-
.bacco to supply their wants. We cannot perceive that the
·public or private interests require the chancellor to assume
jurisdiction of this case for the purpose of settling this
quarrel between those who were ·members of this board,
although the controversy has resulted in the withdrawal of
membership by those who are dissatisfied with the board's
action, and the case must be left to be settled by litigants,
whose personal interests in the prosperity of the trade will
certainly lead them to a fair adjustment of their differences
without the aid of the chancellor.

The judgment is therefore affirmed.

(Messenger v. Penn, 36 New Jersey Law, 410; 15 Wis-
·consin, 318.)