Felix G. Blackwell, Appellant, v. John M. Laird and G. Thomas Laird, Doing Business Under the Name of Laird Brothers Live Stock Commission Company, Respondents.—163 S. W. (2d) 91.

Kansas City Court of Appeals.   May 25, 1942.

Cornelius Roach and Daniel L. Brenner for appellant.

C. G. Myers, Leslie A. Welch and Clyde J. Linde for respondent.

1218

CAVE, J.—This is an appeal from a judgment of the Circuit Court of Jackson County against plaintiff (appellant), and in favor of defendants (respondents). The cause was tried to the court sitting as a jury and on an agreed statement of facts. The essential facts, briefly stated, are:

The plaintiff was a farmer in Jackson County, and one of his farm hands stole ten head of his cattle and transported them by truck from his farm to the Kansas City Stock Yards, and sold them to two established live stock traders, Cahill and Swoboda; thereafter, Cahill, in the usual course of business at the stock yards, consigned these cattle, along with some other cattle, to respondents (John M. Laird and G. Thomas Laird, doing business under the name of Laird Brothers Live Stock·Commission Company), to sell for Cahill's account and remit the proceeds, less .commission charges, to him. Accordingly, Laird Brothers sold the cattle, deducted from the sale price the commission, and remitted the balance of $459.36 to Cahill. Thereafter, plaintiff (appellant) sued Cahill, Swoboda and Laird Brothers for the value of the cattle, claiming his hired man had sold his cattle without his authority. Upon a jury verdict for plaintiff against Cahill and Swoboda, but in favor of Laird Brothers, an interlocutory judgment for $545 was rendered against Cahill and Swoboda, and subsequently a new trial was granted as to Laird Brothers. On a retrial before the court without a jury, the court found for Laird Brothers and rendered judgment accordingly, from which this appeal was perfected. It was admitted that at all times here involved, Laird Brothers Live

Stock Commission Company acted as a "market Agency," under the Packers and Stockyards Act (7 U. S. C. A:, secs. 201 to 217), and under the rules and regulations of the Secretary of Agriculture of the United States, and in the usual course of business. It was further admitted that Laird Brothers had no notice of any interest, right or title of plaintiff in and to the cattle.

The respondents pleaded and now urge by way of defense that under the "Packers and Stockyards Act" above referred to, they were required to render market service to all persons applying for such service, and promptly receive and sell for a commission, without discrimination, all live stock consigned to them for sale and to immediately account to the consignors of said live stock for the proceeds of such sales; that the business of respondents under said Act was a "public utility," and that the operator of a public utility must render service to all who apply for the same, absent actual notice that an applicant was legally not entitled to same.

The sole question presented is whether the respondents, as sellers of the stolen cattle, are liable to the appellant, as owner, for their value, even though respondents had no notice or knowledge of appellant's interest in said cattle.

Appellant contends that respondents, as sellers of the stolen cattle, are liable for their value, even though they had no knowedge that the cattle had been stolen; and to support that contention, cites and relies upon the general rule that a seller of stolen property, even though innocent, is liable for the value of the property; citing Mohr v. Langan, 77 Mo. App. 481, 162 Mo. 474; Koch v. Branch & Crooks, 44 Mo. 542; Kramer v. Faulkner, 9 Mo. App. 34; Laughlin v. Barnes & Parrott, 76 Mo. App. 258; Bank v. Metcalf, Moore & Co., 40 Mo. App. 494; Ess v. Griffith, 128 Mo. 50; Michael-Swanson-Brady Produce Co. v. Oregon Short Line R. R. Co. et al., 271 S. W. 854; and Mason City Production Credit Association v. Sig. Ellingson & Co., 286 N. W. 713, 308 U. S. 599, 60 Sup. Ct. 130.

The Packers and Stockyards Act, *supra,* among other things, provides:

Section 201 (c): "The term 'market agency' means any person engaged in the business of (1) buying or selling in commerce live stock at a stock yard on a commission basis, or (2) furnishing stock yards services; . . ."

Section 205 provides:

"It shall be the duty of every stock yard owner and *market agency* to furnish upon reasonable request, *without discrimination,* reasonable stock yard services at such stock yard." (Italics ours.)

Section 201 (b) provides:

"The term 'stock yard services' means services or facilities furnished at a stock yard in connection with the receiving, buying or *selling on a commission basis* or otherwise, marketing, feeding, water-

ing, holding, delivery, shipping, weighing or handling in commerce of live stock.'' (Italics ours.)

The United States Supreme Court has held that the various stock yards of the country, coming within the Act, and the marketing agencies connected therewith, are public utilities and must comply with rules prescribed by the Secretary of Agriculture. [Tagg Brothers & Moorhead v. United States, 280 U. S. 420; Morgan v. United States, 298 U. S. 468; Stafford v. Wallace, 258 U. S. 495.] The court, in the last cited case, said of the Act:

''The Act, therefore, treats the various stock yards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the west to the consumers in the east. It assumes that they conduct a business affected by public use of a national character and subject to national regulation. That it is a business within the power of regulation by legislative action needs no discussion.''

It being admitted in the stipulation of facts that the respondents herein were a ''*market agency*'' under said Act and were subject to said Act and the rules and regulations of the Secretary of Agriculture for the United States, it follows as a matter of course that they must render to an applicant upon reasonable request and ''*without discrimination*'' the services which they are authorized to perform, to-wit: the selling of live stock for a commission, and under the regulations of the Secretary of Agriculture, remit the net proceeds to the shipper. [United States v. Donahue Brothers, Inc., 59 Fed. (2d) 1019, 1. c. 1023.] Therefore, it would seem to be clear that the stock yards and market agencies which are subject to and are operating under the above Act are public utilities and are bound to reder to the public the services therein required. If that be true, then we are confronted with the question—Is a ''market agency,'' which is bound to render the services of selling, for a commission, live stock upon application of a person presenting himself, in possession of such live stock, liable in conversion if the person delivering the property and demanding the service is not the true owner? It seems to be the generally accepted rule that ''where one is in possession of personal property, such possession is *prima-facie* evidence of ownership in him.'' [White Live Stock Commission Company v. Ry., 87 Mo. App. 330; Nanson v. Jacob, 93 Mo. 331; Smith v. Colby, 67 Maine 169, and Gurley v. Armstead, 148 Mass. 267.] In this case, there is no question but what Cahill was in possession of the cattle at the time he made application to the respondents to sell the same, and there is no evidence or intimation that Cahill knew the cattle had been stolen, or had any reason to suspect it; on the contrary, the stipulation admits that the respondents acted in good faith in selling said cattle and remitting the net proceeds to Cahill. It is also conceded that the sale was made in the usual course of business and that the respondents

rendered the service and made the sale in the manner they were required to do under the "Packers and Stockyards Act." There is no evidence or charge of negligence on the part of respondents. They, not being negligent, and having no notice that the persons bringing the cattle to them to be sold was not the true owner, it would seem unjust that they should be bound by law to do an act (sell the cattle) which the law, in the event the person bringing the goods was not the true owner, declared to be an unlawful act. [White Live Stock Commission Co. v. Ry., *supra*.]

In Nanson v. Jacob, *supra,* our Supreme Court, in discussing the question of liability of a common carrier (a public utility) for conversion of goods belonging to another, said this: (1. c. 339, etc.)

"Common carriers, by reason of the nature of their business, which imperatively requires them to receive and forward goods, when tendered in the usual course of their business, have long formed an exception to the stringency of general rules, in respect to what constitutes, in similar cases, a conversion. The authorities on this point are abundant. . . .

"And where a person receives goods by delivery from one whom he is entitled to regard as the owner, and having so received them, conveys them to another, to whom they are sent, he does no tortious act. [Parker v. Godine, 2 Strange, 813.]

"A conversion may be proved in three ways: (1) By a tortious taking; (2) by any use or appropriation to the use of the person in possession, indicating a claim of right in opposition to the rights of the owner; (3) by a refusal to give up possession to the owner on demand."

The same distinction and principle is announced and followed in Gurley v. Armstead, *supra*; and Shellnut v. Central of Georgia Ry. Co., 131 Ga. 404.

In Abernathy et al. v. Wheeler et al., 17 S. W. 858, the Court of Appeals of Kentucky held a public warehouseman was not liable in conversion for storing and selling, for a commission, tobacco which had been delivered to it by a person not holding title. The Court said:

"It is settled that a public warehouseman, receiving, storing, and selling goods in his line of duty on commission, and having no property interest in the goods, and having no notice of an adverse claim to them, is not guilty of a conversion of them by the mere sale of them on account of the person that consigns them to his house for sale. In such case the warehouseman asserts no interest in the goods or right to them hostile to the mortgagee or true owner; he simply acts as a custodian and mouthpiece of the apparent owner. . . . and when the tobacco is presented to them for public storage and sale, by the apparent owner, in the usual way, and they, having no knowledge or information that others had an adverse interest in the tobacco, and

there being no fact or circumstance attending the transaction that should put them, as persons of ordinary prudence, upon inquiry as to the rights of others in reference to the tobacco, it would not be in the interest of trade to require them to institute inquiry and investigation before sale as to true condition of the title of the tobacco."

Appellant has called to our attention and ably argues that we should follow a decision of the Supreme Court of Minnesota in the case of Mason City Production Credit Assn. v. Sig Ellingson & Co., 286 N. W. 713, wherein the court construed the "Packers and Stockyards Act" and held that while the defendant in that case was a "market agency" under the Act, nevertheless when it sold mortgaged property delivered to it by the mortgagor, it was liable to the mortgagee in conversion, even though it had no knowledge of such mortgage. In discussing the above Act, the court said:

"There is no indication in the history of this legislation nor in the Act itself of an intention to shield either purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or covered by chattel mortgages of which the purchasers or market agencies may be in fact ignorant. Courts should be slow to conclude that the Act was designed to supersede local law respecting the force and effect of chattel mortgage security upon livestock received at public stockyards."

The Minnesota Supreme Court undertook to distinguish its holding from that of the Kentucky Court of Appeals decision, by saying: "In the Abernathy case nothing is stated in the decision as to whether or not the chattel mortgage was properly filed." However, upon a careful examination of the opinion, we find that the Kentucky Court of Appeals said: "which mortgage was duly recorded, etc." However, we do not understand that the Kentucky Court founded its conclusion on that fact, but on the contrary, it bottomed its decision upon the proposition that the public warehouseman there "had no right to select their customers and refuse others." We recognize that the decision of the Minnesota court strongly supports appellant's contention and that the conclusions reached therein are persuasive, but they are only persuasive and not binding on this court.

We have examined the other cases relied on by appellant as above referred to, and without discussing each case separately, we conclude that they are not in point, because none of those cases discuss a set of facts where the defendant is a public utility required by law to render certain specific service to the public without discrimination. If the respondents had exercised some dominion over the property which they were not required by law to do, then a different question would be presented.

We prefer to follow the line of decisions which hold in effect that a public utility which is required by law to render specific services to the public without discrimination, should not be considered in the

same category with those who may or may not transport, store, or sell property at the request of one in possession thereof. In this case, the respondents performed the act which they were required to perform, to-wit: the selling of the cattle for a commission, and exercised no other dominion or control over the property other than that.

We conclude that the weight of authority supports our conclusion.

Finding no reversible error, the judgment of the trial court must be affirmed. It is so ordered. All concur.