E. H. BIRMINGHAM, Appellant, v. RICE BROS., a partnership, Appellee.

No. 46932.

FEBRUARY 11, 1947.

Opinion Modified and Rehearing Denied May 9, 1947.

V. O. DeWitt and Crary, Munger & Crary, all of Sioux City, for appellant.

Myers & Snerly, of Chicago, Illinois, and Stilwill, Brackney, Stilwill & Wilson, of Sioux City, for appellee.

Oliver, J.—The facts in this case are not in dispute. Appellant Birmingham, a livestock dealer at the stockyards in Sioux City, Iowa, owned fifteen cattle. June 6, 1945, a stranger, falsely and fraudulently representing himself to be John Brainman, of Dell Rapids, South Dakota, wrongfully and fraudulently obtained said cattle from appellant by making in said name and issuing to appellant a false and worthless check for the purchase price thereof. Pretended Brainman told appellant he proposed to feed the cattle on his farm at Dell Rapids. However, pretended Brainman engaged a trucker to transport and deliver said cattle, not to Dell Rapids but to appellee Rice Bros., a commission broker or factor selling and handling livestock for others at the stockyards in Sioux Falls, South Dakota. Appellant did not learn of this delivery to appellee for immediate resale (which probably would have warned him of the fraudulent scheme) until sometime later. As factor for pretended Brainman, appellee sold said cattle to a third party and collected and paid to pretended Brainman the proceeds of said sale, less expenses and its commission. Appellant made no investigation of pretended Brainman prior to his dealings with him nor is it contended appellee did so. Apparently both dealt with pretended Brainman in good faith and relied upon his representations.

Thereafter appellant instituted this action against appellee for damages for the wrongful conversion of said cattle.

Appellee's defenses may be divided into two classes: one, that it acted in good faith and without notice of appellant's ownership of the cattle, and appellant's loss was due to his failure to investigate pretended Brainman; and two, that the Packers and Stockyards Act, 7 U. S. C., chapter 9, section 181 et seq., absolved it from liability. At the conclusion of the evidence each side moved for a directed verdict. The trial court sustained appellee's motion generally and (we assume, in the absence of objection, though the printed record is inadequate) judgment was entered thereon. Birmingham has appealed.

█ I. Unquestionably, by reason of the fraud practiced by pretended Brainman upon appellant in obtaining the cattle, title thereto, as between said parties, did not pass, and appellant could have maintained an action against him for the recovery of the cattle or for damages for their wrongful conversion. 53 Am. Jur., Trover and Conversion, section 31; Mulroney Mfg. Co. v. Weeks, 185 Iowa 714, 171 N. W. 36. However, the question here concerns appellant's right of recovery against appellee, who sold the cattle to a third person and remitted the proceeds to pretended Brainman. The general rule in such cases is thus stated in 22 Am. Jur., Factors, section 48:

█ "As a general rule, a factor or commission merchant who receives property from his principal, sells it under the latter's instructions, and pays him the proceeds of the sale is guilty of a conversion if his principal had no title thereto or right to sell the property; and the factor may not escape liability to the true owner for the value of the property by claiming that he acted in good faith and in ignorance of his principal's want of title."

35 C. J. S., Factors, section 57b, states:

"* * * this rule is particularly applicable * * * where the principal had stolen the goods or obtained them through fraud or forgery * * *."

See, also, annotation in 20 A. L. R. 132 et seq.
Restatement of the Law, Agency, section 349, states:

"An agent who does àcts which would otherwise constitute conversion of a chattel is not relieved from liability by the fact that he acts on account of his principal and reasonably, although mistakenly, believes that the principal is entitled to possession of the chattels."

The general rule, above noted, is not unanimous. As pointed out in 2 Mechem on Agency, section 2583, there are a few decisions to the contrary. That text cites several decisions from Kentucky and Tennessee and decisions from several other states as so holding. Among these is an earlier Minnesota decision. However, Kentucky and Tennessee, and perhaps one or two others, seem to be the only jurisdictions now apparently committed to the minority rule. One decision cited by Mechem, and also by a note in 50 L. R. A., N. S., 52, 56, as enunciating what may be called the minority, or Tennessee-Kentucky doctrine, is Abernathy & Long v. Wheeler, Mills & Co., 92 Ky. 320, 17 S. W. 858, 36 Am. St. Rep. 593, upon which appellee places much reliance and to which we will later refer.

Johnson v. Martin, 87 Minn. 370, 92 N. W. 221, 59 L. R. A. 733, 94 Am. St. Rep. 706, distinguishes some earlier Minnesota decisions and holds a factor who sold grain acquired by his principal by a forged instrument is liable to the true owner for conversion, and it is no defense that the factor, throughout the entire transaction, acted in good faith, without negligence, and in the supposition that the forger was the real owner.

Both Iowa, where the cattle were fraudulently procured from appellant, and South Dakota, where appellee received and disposed of them, follow the general rule.

First National Bank of Pipestone v. Siman, 65 S. D. 514, 517, 275 N. W. 347, 348 (first appeal), states:

"However, we are of the opinion that the question of notice or knowledge of the mortgage by these defendants [factors] is not decisive of their liability in this case. If the defendants were not purchasers of these sheep, and we agree with respondent that they were not, they were the agents of

Harms in selling and disposing of the sheep to the packing company. By the great weight of authority an agent who assists his principal in converting property of a third person to the use of the principal or master is personally liable to the true owner for the loss thereby inflicted * * * The only defense is that the defendants acted innocently and without knowledge or notice of plaintiff's mortgage. However, we are convinced that innocence or lack of notice or knowledge is no real defense."

Mau v. Rice Bros., 216 Iowa 864, 868, 249 N. W. 206, 208, states:

"It is in evidence that the defendant handled the hogs on a commission basis and that it received but a small commission for its services. Appellant contends that it is not liable for the conversion of the hogs because of its representative relationship with Lenz. There is no merit in this contention. In the case of Warder-Bushnell & Glessner Co. v. Harris, 81 Iowa 153, 46 N. W. 859, this court said:

" 'The defendant Harris took and converted this property. He is liable for damages. The fact that he was agent of his co-defendant does not discharge him from this liability. The act was not done under a contract. It was done in violation of plaintiff's rights, and without the sanction of law. It was therefore a tort, for which he is presumably liable.'

"In other jurisdictions the courts are almost a unit in holding that a broker, factor, or commission merchant cannot escape liability for the wrongful sale of property by reason of their agency relationship. 25 C. J. 411, section 143; 20 A. L. R. 132. The fact that the defendant's profit from the transaction was small is immaterial, because it is not necessary that profit flow to the party guilty of the conversion to create liability for the conversion."

This rule is merely an application of the rule of liability ordinarily applicable to agents. 2 Am. Jur., Agency, section 328; 3 C. J. S., Agency, section 221d. The factor, even though innocent, is liable if he assists in such conversion, because he

stands in the shoes of his principal. The liability of both principal and factor is based not upon contract but upon tort.

So in the case at bar (aside from the defense of the Packers and Stockyards Act, which will be hereinafter considered) appellee's defenses were without merit and, under the undisputed facts, its liability for conversion was established as a matter of law.

■ II. Appellee is a licensed market agency operating at Sioux Falls stockyards under the Packers and Stockyards Act of 1921. 7 U. S. C., chapter 9, section 181 et seq., August 15, 1921, 42 Stat. at L., chapter 64, 159 et seq. The Act makes it the duty of every stockyard owner and market agency, "to furnish upon reasonable request, without discrimination, reasonable stockyard services at such stockyard. * * * to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable or discriminatory regulation or practice is prohibited and declared to be unlawful. * * * It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the receiving, marketing, buying, or selling on a commission basis or otherwise * * *."

Appellee contends the act requires it, as a public utility, to serve all comers promptly and receive and sell all livestock consigned to it for sale; that it could not select whom it would serve, and hence was not liable for selling livestock to which its principal had no title, in the absence of knowledge or notice to it. The theory is that the act affects and destroys certain legal rights of members of the public whose livestock may be wrongfully taken to such stockyard by a thief or other wrongdoer and sold for said wrongdoer by his factor.

It may be here said that the specific provisions of the act substantially accord with the common-law rule applicable to public utilities in general. The rule is thus stated in 51 C. J., Public Utilities, section 16:

"A public utility is obligated by the nature of its business

to furnish its service or commodity to the general public, or that part of the public which it has undertaken to serve, without arbitrary discrimination, and it must, to the extent of its capacity, serve all who apply, on equal terms and without distinction, so far as they are in the same class and similarly situated. Accordingly, a utility must act toward all members of the public impartially, and treat all alike; and it cannot arbitrarily select the persons for whom it will perform its service or furnish its commodity, nor refuse to one a favor or privilege it has extended to another, since the term 'public utility' precludes the idea of service which is private in its nature and is not to be obtained by the public. Such duties arise from the public nature of a utility, and statutes providing affirmatively therefor are merely declaratory of the common law.''

The text in 43 Am. Jur., Public Utilities and Services, section 22, states:

''* * * the public utility is under a legal obligation to render adequate and reasonably efficient service impartially, without unjust discrimination, and at reasonable rates, to all members of the public to whom its public use and scope of operation extend who apply for such service and comply with the reasonable rules and regulations of the public utility.''

In the language of this court, in Phelan v. Boone Gas Co., 147 Iowa 626, 628, 125 N. W. 208, 209, 31 L. R. A., N. S., 319:

''Corporations or persons who undertake to supply a demand which is 'affected with a public interest' are not a law unto themselves, but are required to supply all alike who are alike situated, and are not permitted to discriminate in favor of or against any.''

Although there may be statements in some decisions that a public utility must serve all comers, courts are in general agreement as to the limitations and exceptions above stated. For example, a railroad is not required to receive and transport property, the transportation of which is illegal, property of a dangerous character, or property not properly packed (13

C. J. S., Carriers, section 28), and it may refuse to transport persons who refuse to comply with its reasonable regulations or are likely to interfere with the safe and convenient conduct of its business (13 C. J. S., Carriers, sections 538–540). Many other examples might be given. Neither by common law nor any statute (called to our attention) is any public utility required to serve all. The conduct prohibited is always *unjust* discrimination, *unfair* rates or practices, or *unreasonable* rules.

That is the interpretation placed upon this act by the courts. United States v. American Live Stock Comm. Co., 279 U. S. 435, 437, 49 S. Ct. 425, 426, 73 L. Ed. 787, 788, involved a boycott of Producers Commission Association by market agencies. The court held the agencies were required to deal with the Producers as to livestock of its members but had the right to refuse to deal with it as to livestock bought or sold for others. " * * * some at least of its business was legitimate" and the decision was expressly limited to this legitimate business. This holding was followed in Farmers Livestock Comm. Co. v. United States, D. C., Ill., 54 F. 2d 375, 380, in which the court stated that if the boycotted firms insisted upon doing business only on an irregular basis, "inasmuch as it is not in the usual course of business, plaintiffs are justified in refusing to deal."

These holdings recognize the right of market agencies to require some reasonable showing that each proposed transaction is a legitimate one which the other party has the right to make. Under the act, reasonable rules and regulations to this end would be proper. Hence the conclusion is warranted that such an agency is not required to handle stolen livestock or livestock to which the title of its principal is defective and may make reasonable requirements that one proposing to deal with it establish his identity and the ownership of and title to the livestock involved.

Certainly Congress did not adopt the Packers and Stockyards Act to encourage and protect the operation of fences for handling property stolen or procured by fraud. The act merely makes it the duty of such agencies to furnish upon

*reasonable request, without discrimination,* reasonable stock-yard services. It is not wrongful *discrimination* to refuse to aid a criminal in his crime, nor is a request that one dispose of property fraudulently procured or stolen a *reasonable request.*

However, the proposition just considered is not the ultimate one before us. The precise question here is not what regulations the act imposes upon market agencies but what legal rights, if any, it takes away from the general public. Even though the act did burden the operations of market agencies to the extent asserted by appellee, it would not necessarily follow that Congress intended, in exchange therefor, to relieve such agencies from liability in tort for wrongful conversion and thus abrogate legal rights subsisting in the general public under state laws. Every decision of a court of last resort, brought to our attention, which has determined the question, holds the Packers and Stockyards Act does not absolve the factor from liability for conversion in cases of this nature.

Mason City Production Credit Assn. v. Sig Ellingson & Co., 205 Minn. 537, 541, 286 N. W. 713, 715, states:

"The chief effort of defendant on this appeal is to establish that it 'being a federal public utility, licensed by the federal government to act as such and required to conduct its business in accordance with the federal law, the question of its liability is to be determined by the federal law, and not by the laws of the state of Iowa, or the state of Minnesota.' In short, the contention is that by the Packers and Stockyards Act (42 Stat. 159, 7 USCA, §§181–229) congress took over the entire field of raising and marketing livestock for human consumption, and that defendant, registered thereunder as a market agency, must for a fixed commission sell any shipment consigned to it for sale and account to the consignor for the proceeds regardless of the consignor's title or interest in the consignment. It is the law that defendant, registered as a buyer and seller of livestock on commission, at the stockyards of South St. Paul, is a market agency under the act 'and must conform to the lawful rules and regulations made in virtue

thereof by the secretary of agriculture. United States v. American Livestock Comm. Co. 279 U. S. 435, 49 S. Ct. 425, 73 L. ed. 787; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; United States v. Donahue Bros. Inc., (8 Cir.) 59 F. (2d) 1019. Defendant says that since it is not at liberty to select its customers or principals for whom it sells it is unreasonable to hold it liable in conversion where, as a mere agent, it is required by law to make a sale of mortgaged livestock.

"The Packers and Stockyards Act was passed to remedy abuses that had grown up in the large stockyards located in various places of the nation, whereby, among other wrongs, raisers, feeders, and shippers of livestock were charged unequal and excessive rates for services rendered in handling and selling the stock after reaching the yards. The occasion for and the purpose of the act we find exhaustively treated in Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. ed. 735, 23 A. L. R. 229. It is hard to believe that congress by this act intended to take over the entire field of the livestock industry, not only the marketing thereof at the stockyards, but also to control all the steps of those who raise livestock for such market. It is common knowledge that raisers and feeders of livestock for slaughter often borrow money in order to carry on and can do so only by giving as security chattel mortgages upon the stock being raised and fed for the market. There is no indication in the history of this legislation nor in the act itself of an intention to shield either purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or covered by chattel mortgages of which the purchasers or market agencies may be in fact ignorant. Courts should be slow to conclude that the act was designed to supersede local law respecting the force and effect of chattel mortgage security upon livestock received at public stockyards.

"Defendant cites and relies on cases holding common carriers not liable in conversion for transporting stolen property or property covered by chattel mortgages which forbid

the property being moved * * *. It is, however, to be noted that the carrier in transporting does not undertake to deal with or affect in any manner the rights or title of the owners or chattel mortgagees in the shipments. The same applies to the cases of warehousemen cited by defendant * * *

"Defendant contends that this judgment obstructs and unduly burdens interstate commerce and thus violates the commerce clause of the federal constitution; and also that it deprives defendant of its property and of the equal protection of the law guaranteed by the fourteenth amendment to that constitution.

"The losses occasioned a market agency like defendant from disposing of stolen livestock or of livestock mortgaged and wrongfully consigned to it contrary to the terms of the duly filed mortgage cannot be assumed to be of a magnitude sufficient to unduly burden interstate commerce."

The Minnesota decision was followed in First National Bank of Pipestone v. Siman, 67 S. D. 118, 289 N. W. 416, which case was previously before that court in 65 S. D. 514, 275 N. W. 347, from which we quoted in the first part of this opinion.

The Supreme Court of Washington decided the same proposition in Moderie v. Schmidt, 6 Wash. 2d 592, 597, 108 P. 2d 331, 334, holding a commission company liable in conversion to the owner of cattle after said factor paid the proceeds of the sale to the drover from whom it received the cattle, and stating:

"The trial court's opinion was pronounced before the recent opinion in Mason City Production Credit Ass'n v. Sig Ellingson & Co., 205 Minn. 537, 286 N. W. 713, appeared in the law reports. In this case, the court distinguished the common carrier cases relied on by respondents in this case, and, in discussing the packers and stockyards act, said, in part: 'There is no indication in the history of this legislation nor in the act itself of an intention to shield either purchasers or market agencies from liability on account of wrongful sales in the stockyards of livestock not owned by the consignors or

covered by chattel mortgages of which the purchasers or market agencies may be in fact ignorant.'

"The supreme court of the United States denied a petition for a writ of certiorari (308 U. S. 599, 84 L. Ed. 501, 60 S. Ct. 130), and later, a motion for a rehearing of the petition (308 U. S. 637, 84 L. Ed. 529, 60 S. Ct. 178). *We note that the solicitor general of the United States appeared in the supreme court and opposed the granting of the writ. It seems reasonable to infer that the decision of the Minnesota supreme court was satisfactory to the Federal authorities charged with the administration of the packers and stockyards act.*" (Italics supplied.)

The only contrary holding brought to our attention is by an intermediate court of appeals, Blackwell v. Laird, 236 Mo. App. 1217, 163 S. W. 2d 91. That case holds a market agency under the act is not liable when it accepts and sells stolen cattle on commission if it does not know the cattle were stolen and is not negligent. Cresswell v. Leftridge, Mo. App., 194 S. W. 2d 48, cites the Blackwell case but does not mention the act. It concludes the factor was a mere bailee or conduit pipe. See 2 Am. Jur., Agency, section 328.

Both Missouri decisions are influenced by the Tennessee-Kentucky rule which is contrary to the Iowa (majority) rule followed in Division I of this opinion. Both cases approve a lengthy quotation from Abernathy & Long v. Wheeler, Mills & Co., supra, 92 Ky. 320, 17 S. W. 858, 36 Am. St. Rep. 593, a case which, as we have already pointed out, was listed by Professor Mechem as following the minority doctrine. Appellee argues the Abernathy case is "almost squarely in point with the instant case." Were this conclusion correct it would not persuade us to discard the majority rule long in effect in Iowa.

We are satisfied to adopt the essential reasoning of the Sig Ellingson case concerning the Packers and Stockyards Act. It is unnecessary that we repeat that discussion, hereinbefore quoted, in the same or similar language. It may be that some of the language in that decision, concerning chattel

mortgages and the effect or necessity of recording where the principal has actual knowledge thereof, is susceptible to an interpretation not wholly in accord with some of our pronouncements. We regard that as here immaterial. Nor are we concerned with appellee's complaint that said decision misinterprets the Abernathy (Kentucky) case. We have already referred to that case as contrary to the majority rule.

That the South Dakota and Washington Supreme Courts have been content to rest their decisions on the reasoning of the Sig Ellingson case attests to their determination that it is sound and adds to its persuasive force. The construction placed upon the act by the federal authorities charged with its administration, for whom the solicitor general of the United States appeared in the United States Supreme Court and resisted (successfully) the granting of a writ of certiorari from the Sig Ellingson decision, is also entitled to weight.

It is our conclusion that the Packers and Stockyards Act does not absolve appellee from liability for wrongful conversion in this case. We hold such liability was established as a matter of law and that the trial court should have sustained appellant's motion for directed verdict. With instructions that said motion be sustained and judgment for appellant and against appellee be rendered accordingly, the cause is—Reversed and remanded with instructions.

GARFIELD, HAYS, MULRONEY, and BLISS, JJ., concur.

SMITH, J., and WENNERSTRUM, C. J., and HALE and MANTZ, JJ., dissent.

SMITH, J. (dissenting)—Being unable to agree with the conclusion reached in Division II of the majority opinion I shall state as briefly as may be the ground of my dissent. The question becomes more important as the business of packing and stockyards and allied industries becomes more and more complex and vital to the life and welfare of society.

The common-law rule of agents' and factors' liability (discussed in Division I of the majority opinion) has become a harsh one as the relationship has of necessity become more

impersonal. So long, however, as the agent is free to determine whom he will represent and what means he will employ to reach such determination the rule is not unjust that makes him liable for the consequences in case he assists, even unknowingly, in the perpetration of a wrong by his principal upon a third person.

The so-called Packers and Stockyards Act has, I believe, changed the character of the relationship between those stockyards and market agencies that come within its provisions and their patrons or customers.

The act makes it the "*duty*" of every "stockyard owner" and "market agency" "to furnish upon reasonable request, without discrimination, reasonable stockyard services * * *." 7 U. S. C., chapter 9, section 205, August 15, 1921, chapter 64, section 304, 42 Stat. at L. 164. They are required to register with the secretary of agriculture, who may require reasonable bonds from every "market agency" "to secure the performance of their obligations." It is required that their rates or charges shall "be just, reasonable and nondiscriminatory" and schedules of such rates must be filed with the secretary, printed and kept open to public inspection at the stockyards, and the secretary may hold hearings thereon. 7 U. S. C., chapter 9, sections 204, 206, 207.

The act also provides: "It shall be the duty of every stockyard owner and market agency to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices in respect to the furnishing of stockyard services, and every unjust, unreasonable, or discriminatory regulation or practice is prohibited and declared to be unlawful." 7 U. S. C., chapter 9, section 208. (The term "stockyard services" includes "buying, or selling on a commission basis." Id. section 201.) And:

"It shall be unlawful for any stockyard owner, market agency, or dealer to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with * * * buying, or selling on a commission basis * * *." Id. section 213.

There are also provisions for punishing violations of the act and orders of the secretary of agriculture thereunder.

What are the purposes of the act? In Stafford v. Wallace, 258 U. S. 495, 513, 514, 42 S. Ct. 397, 401, 66 L. Ed. 735, 23 A. L. R. 229, it is said the purpose of the act is:

"* * * to regulate the business of the packers done in interstate commerce * * * and forbids them to engage in unfair, discriminatory or deceptive practices * * * or to subject any person to unreasonable prejudice therein, or to do any of a number of acts to control prices or establish a monopoly in the business."

But it is also said in that case:

"The object to be secured * * * is the free and unburdened flow of live stock * * * through the great stockyards and slaughtering centers * * * in the form of meat products to the consuming cities of the country * * * or, still as live stock to the feeding places and fattening farms * * * for further preparation for the market."

So much for the *purposes* of the act. How does it propose to accomplish such purpose? The opinion proceeds:

"The act, therefore, treats the various stockyards of the country as great national public utilities to promote the flow of commerce from the ranges and farms of the West to the consumers in the East. *It assumes that they conduct a business affected by a public use* of a national character and subject to national regulation." (Italics supplied.)

And what is the effect upon the relationship of these agencies to those they serve? The supreme court in effect says the act requires the adoption of the "conduit" theory:

"*The stockyards are but a throat through which the current flows, and the transactions which occur therein are only incident to this current * * * The commission men are essential in making the sales without which the flow of the current would be obstructed * * *.*" (Italics supplied.)

This conclusion is reached and announced as justification for government regulation in the interest of the consuming public which is dependent upon the industry. But if sound, its implications should not be rejected when invoked by the utility that is made subject to the regulation. The act should not be interpreted in one way for one purpose and in a different way for another. The agencies should not be held to be converted by the act into public utilities, required to serve without discrimination and still held to personal responsibility for the honesty and good faith of the customers they are required to serve.

Other cases recognizing that the act does change the status of these agencies from that of ordinary factors to that of public utilities are not wanting: Tagg Bros. & Moorhead v. United States, D. C., Neb., 29 F. 2d 750, affirmed 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524; Farmers Livestock Comm. Co. v. United States, D. C., Ill., 54 F. 2d 375; Nashville Union Stockyards, Inc. v. Grissim, 153 Tenn. 225, 280 S. W. 1015; Blackwell v. Laird, 236 Mo. App. 1217, 163 S. W. 2d 91.

It is true the primary purpose of the act is to prevent conspiracies to obstruct commerce that would tend to the formation of monopolies. It attempts to do this by making of the instrumentalities public utilities and enacting rules for their regulation. They are required, in accepting requests for service, "to establish, observe, and enforce just, reasonable, and nondiscriminatory regulations and practices," applicable to all alike. These practices must be followed even though their nonobservance in an individual case may constitute no threat of monopoly.

What reasonable regulation or practice would enable the utility to protect itself in a case of this kind? It may not exact from one customer a showing as to title or right that it does not exact from all others. Otherwise, it would risk incurring liability to the prospective customer against whom it thus discriminated.

It is obvious any general rule or practice of requiring everyone to show title or right of disposition of property offered for sale would impede and obstruct the flow which the

act seeks to make free and unburdened. Of course, if there were suspicious circumstances in a given case sufficient to put the agency on inquiry, a different situation would be presented. But in the absence (as here) of any ground for suspicion it is difficult to see how any general rule of practice could enable the agency to protect itself or the real owner of the property without slowing down and obstructing the very processes the act is designed to make free and unobstructed.

Perfect analogies are never available, but common carriers and public warehousemen are fair examples of utilities that are not subject to the rule of liability imposed upon ordinary agents. The common carrier is uniformly held free from liability to the true owner of goods if without notice of such ownership it receives and delivers such goods upon request of an unauthorized consignor with apparent right of possession and control. 9 Am. Jur., Carriers, section 323; 10 C. J., Carriers, section 393; 13 C. J. S., Carriers, section 172e.

The same immunity is conceded to the public warehouseman who without notice of the rights of the true owner sells stored goods upon direction of an unauthorized bailor. 67 C. J., Warehousemen and Safe Depositaries, section 171; 27 R. C. L., Warehouses, section 61.

It is true the common carrier does not undertake to deal with or in any way affect the title of the property transported. But it may and frequently does make impossible the recapture by the rightful owner of the possession of which he has been wrongfully deprived.

The textual statement as to public warehousemen above credited to Corpus Juris and Ruling Case Law is based upon Abernathy & Long v. Wheeler, Mills & Co., 92 Ky. 320, 17 S. W. 858, 36 Am. St. Rep. 593. This case is sometimes assumed to represent a "minority view" as to the liability of factors and agents generally for conversion.

I do not so regard it. The case involved a public tobacco warehouse—not an ordinary agent or bailee but a public utility. 67 C. J., Warehousemen and Safe Depositaries, section 4B; Gray v. Central Warehouse Co., 181 N. C. 166, 106 S. E. 657;

Nash v. Page, 80 Ky. 539, 44 Am. Rep. 490. The Abernathy case presents not a "minority view" of the liability of ordinary agents and factors but a well-reasoned statement of the exception to the general rule of liability in the case of a factor that has become a public utility.

Four state appellate courts have had occasion to consider cases similar in principle to the instant case arising under the Packers and Stockyards Act. The earliest, Mason City Production Credit Assn. v. Sig Ellingson & Co., 1939, 205 Minn. 537, 544, 286 N. W. 713, 717, involved the rights of a mortgagee under a recorded mortgage. While it is authority for the holding of the majority here it does attach importance to the fact that plaintiff's mortgage was recorded and that the fact of recording constituted constructive notice to defendant:

"The courts of the states of Iowa and Minnesota have for such a long time, on the principle of comity, enforced rights of holders of chattel mortgages validly made and filed in either state * * *."

The South Dakota and Washington cases (First Nat. Bk. v. Siman, 67 S. D. 118, 289 N. W. 416, and Moderie v. Schmidt, 6 Wash. 2d 592, 108 P. 2d 331) were decided the following year and follow the decision in the Minnesota case without independent or original discussion. The Washington case mistakenly says that in the Minnesota case the solicitor general of the United States appeared in the United States Supreme Court and opposed the granting of a writ of certiorari by that court. That this is not strictly accurate, see 308 U. S. 599, 60 S. Ct. 130, 84 L. Ed. 501. It is true his name appears in resistance to a petition for rehearing. 308 U. S. 637, 60 S. Ct. 178, 84 L. Ed. 529. Denial of a writ of certiorari by the supreme court imports no expression of opinion by that court as to the merits of the case. House v. Mayo, 324 U. S. 42, 65 S. Ct. 517, 89 L. Ed. 739; McCrea v. Jackson, 6 Cir., Mich., 148 F. 2d 193, 197; 36 C. J. S., Federal Courts, section 277.

In Blackwell v. Laird, supra, 236 Mo. App. 1217, 1222, 163 S. W. 2d 91, 94, decided in 1942, the Kansas City (Missouri) Court of Appeals held that a market agency under the Packers

and Stockyards Act was not liable for accepting and selling stolen cattle on commission since it did not know they were stolen and was not negligent. The holding is based squarely on the proposition that the agency was bound as a public utility to render the service upon reasonable request.

I shall not quote at length from the opinion. It refers to the Sig Ellingson (Minnesota) case but declines to follow it:

"We prefer to follow the line of decisions which hold in effect that a public utility which is required by law to render specific services to the public without discrimination, should not be considered in the same category with those who may or may not transport, store, or sell property at the request of one in possession thereof."

And in this connection it is pertinent to requote language which the Blackwell v. Laird case, supra, 236 Mo. App. 1217, 1221, 163 S. W. 2d 91, 93, quotes from Nanson v. Jacob, 93 Mo. 331, 6 S. W. 246, 3 Am. St. Rep. 531:

" 'Common Carriers, by reason of the nature of their business, which imperatively requires them to receive and forward goods, when tendered in the usual course of their business, have long formed an exception to the stringency of general rules, in respect to what constitutes, in similar cases, a conversion.' "

The majority opinion here says:

"Certainly Congress did not adopt the Packers and Stockyards Act to encourage and protect the operation of fences for handling property stolen or procured by fraud."

Certainly not. Nor are railroads operated to enable dishonest persons to make way with stolen or fraudulently obtained goods. And if this were a case where the market agency had knowledge (or should in the exercise of reasonable care have obtained knowledge) that "Brainman" was not Brainman and that his check (given in payment for the cattle) would "bounce," I would agree that it would have been its duty to refuse his request for service.

The contrary is true. There was nothing to suggest that the request was not reasonable; no reason, so far as the record shows, to suggest that the request be denied. Had appellee refused to accept the goods it would have done so at the risk of liability for resultant damage.

Neither the majority opinion nor appellant's briefs have suggested what appellee should have done, or what practice it should follow in accepting or refusing employment, that would have protected both itself and appellant.

I would, for the reasons set out, affirm the decision of the trial court.

WENNERSTRUM, C. J., and HALE and MANTZ, JJ., join in this dissent.